**A.M. SKIER AGENCY, INC., Appellee,**

v.

**Morris GOLD, Sobel Affiliates, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued Jan. 26, 2000.

Filed Feb. 28, 2000.

Bruce J. Kasten, Philadelphia, for appellants.

Daniel T. Brier, Scranton, for appellee.

Before POPOVICH, EAKIN and OLSZEWSKI, JJ.

OLSZEWSKI, J.:

¶ 1 Morris Gold ["Gold"] appeals the order of the Luzerne County Court of Common Pleas granting A.M. Skier's ["Skier"] petition for a preliminary injunction against him. We affirm.

¶ 2 Skier initiated legal proceedings against Gold, a former employee, and Sobel Affiliates, Inc., ["Sobel"] on April 27, 1999. Skier filed a petition for temporary restraining order ["TRO"] and preliminary injunction at the same time. Judge Mark A. Ciavarella granted Skier's petition for a TRO. Judge Michael T. Conahan vacated the TRO on May 7, 1999, and held a hearing from May 10 to May 20, 1999, regarding Skier's petition for a preliminary injunction. Judge Conahan granted the injunction on July 1, 1999. This appeal followed.

¶ 3 Gold began working for Skier, an insurance company, in 1993 as a producer. In that capacity, he solicited accounts for Skier's summer camp insurance program. *See* Findings of Fact at 1. This gave him access to nearly all of Skier's marketing, underwriting, and servicing documents regarding the summer camps Skier insured. *See id.* On March 17, 1999, Gold entered into employment discussions with Sobel, a competitor of Skier's. *See id.* at 2. A month later, Gold resigned from Skier and began working for Sobel. *See id.*

¶ 4 While at Skier, Gold had access to Skier's camp directory, which contained the expiration dates for all of Skier's camp clients, plus readily available public information about the camps. *See id.* The expiration dates were not readily available, and Skier and the rest of the insurance agency considered them highly confidential. *See id.* Gold did not himself generate Skier's directory, but Skier provided him with a copy of the directory to use during his employment. *See id.* After beginning employment discussions with Sobel, but before resigning from Skier, Gold printed a copy of Skier's camp directory, which he placed in a binder. *See id.* The binder was not in his office when he resigned from Skier, nor was the printed copy of the camp directory. *See id.* Other files were also missing from his office. *See id.* at 3.

¶ 5 A few weeks before he resigned but after he began speaking with Sobel, Gold printed 177 documents containing information on seventy-seven of Skier's clients. *See id.* Almost all of the seventy-seven clients in the documents were clients of Henry Skier, the president of Skier. *See id.* While Gold said he printed those documents to investigate discrepancies in the insurance rates between his clients and Henry Skier's, the court below found that Gold had no legitimate reason to access the documents. *See id.* The court below also found that Sobel intended to use this information, along with the client directory, to obtain a competitive advantage. *See id.* Skier employees gathered all of the information in the 177 documents over many years and at great expense and effort. *See id.* at 4. Those documents contained an analysis of client insurance needs, prices, and Skier's "thought processes and methodology" in arriving at those prices. *See id.* Skier limited access to the client directory and the 177 documents to camping department employees and further protected that information with passwords. *See id.* Skier's expert witness testified that the information contained in the 177 documents was highly confidential and never shared with competitors. *See id.* Gold and Sobel did not provide expert testimony on this issue. *See id.*

¶ 6 Skier's employment manual contained a confidentiality provision prohibiting any employee from disclosing such information to any outside person, and Henry Skier never gave Gold permission to give the information to Sobel. *See id.* at 5. Skier and Sobel are competitors, though camp insurance represents seventy percent of Skier's business but just ten percent of Sobel's business. *See id.*

¶ 7 Appellants frame six issues for our review: (1) whether Skier established the necessary elements to support a preliminary injunction; (2) whether the court erred in prohibiting Gold from soliciting clients with whom he had a professional relationship; (3) whether insurance policy expiration dates are trade secrets; (4)

whether Gold may be enjoined from soliciting Skier's clients where he was not burdened by a covenant not to compete; (5) whether a preliminary injunction hearing may be treated as a final hearing on the merits; and (6) whether the court erred in awarding an accounting. *See* appellants' brief at 5. We address each in turn.

¶ 8 Appellants first argue that the court below erred in granting the preliminary injunction. While the "granting of a preliminary injunction is an extraordinary remedy," our review is narrow. *Fedorko Properties, Inc. v. C.F. Zurn & Assoc.*, 720 A.2d 147, 148 (Pa.Super.1998) (citations omitted). When reviewing the grant of a preliminary injunction, " 'we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below.' " *Id.* (quoting *Coatesville Dev. Co. v. United Food & Commercial Workers, AFL–CIO*, 374 Pa.Super. 330, 542 A.2d 1380, 1384 (1988)).

¶ 9 A plaintiff must prove three elements to support a preliminary injunction: (1) a clear right to relief; (2) an immediate need for relief; and (3) an irreparable injury unless the court grants the injunction. *See id.* at 149 (citations omitted). Appellants contend that Skier failed to prove that Gold or Sobel stole Skier's documents. They support this argument with Gold's testimony that he did not steal anything. The court below, however, relying on testimony of Skier employees, explicitly found that Gold printed Skier's client directory and 177 documents and took them. *See* Findings of Fact at 2–3. The court below also found that Gold took files from his office. *See id.* at 3. The judge below saw the demeanor of the witnesses; all we can do is read the record. Thus, we will not disturb the court's credibility determinations without good reason. *See, e.g., Fina v. Fina*, 737 A.2d 760, 765 (Pa.Super.1999). There is no reason to do so here.

¶ 10 The court then concluded that appellants' conduct was actionable, created a threat of immediate and irreparable harm to Skier's client relationships, and could not be compensated with monetary damages alone. *See* Conclusions of Law at 3. The court also found that a preliminary injunction would return the parties "to the position they were [in] prior to [appellants'] wrongful conduct." *Id.* The record and the Findings of Fact give us more than enough information to overcome our standard of "apparently reasonable grounds." Thus, we will not disturb the court's grant of a preliminary injunction.

¶ 11 Appellants next argue that the court below abused its discretion by enjoining Gold from soliciting clients with whom he had a professional relationship prior to his employment with Skier or developed through his individual efforts while employed at Skier. Appellants cite *Fidelity Fund, Inc. v. DiSanto*, 347 Pa.Super. 112, 500 A.2d 431 (1985), for support.

¶ 12 The facts of *Fidelity Fund*, however, are inapposite to those presently before us. In *Fidelity Fund*, Mr. DiSanto owned an insurance company, which he sold in 1975. *See id.* at 433. In 1978, Fidelity hired him to work in its commercial insurance department. *See id.* Fidelity hired DiSanto with the hope that he would attract commercial clients that he had developed while self-employed at his insurance company. *See id.* at 434. DiSanto later left Fidelity to work for another insurance company. *See id.* His new company purchased a list DiSanto had written of his clients while employed by Fidelity. *See id.* The trial court held that DiSanto appropriated trade secrets, but did not distinguish between Fidelity's clients and DiSanto's personal clients. *See id.* A panel of this Court reversed, holding that the lower court erred because any information that DiSanto had prior to his employment with Fidelity was his own. *See id.* at 437.

¶ 13 While the facts of *Fidelity* and this case may, at first glance, appear to be identical, closer inspection reveals other-

wise. In *Fidelity*, DiSanto worked for himself prior to his employment with Fidelity. Here, Gold worked for another insurance company prior to his employment with Skier. In fact, Gold signed a covenant not to compete while with the first company. Therefore, the clients were never Gold's property, unlike DiSanto. When Gold worked for the first insurance company, those clients belonged to that company. When he worked for Skier, those clients belonged to Skier. There is no evidence in the record to show that Gold ever had his own clients. He merely serviced his company's clients. He cannot now take them with him simply because he knew them while at Skier. We thus find appellants' second claim meritless.

¶ 14 Appellants next argue that the court below abused its discretion by protecting the misappropriated information as a trade secret.

¶ 15 To obtain relief for misappropriation of a trade secret, a plaintiff must show:

(1) that there was a trade secret …; (2) that it was of value to employer [owner] and important in the conduct of his business; (3) that by reason of discovery of ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was communicated to the employee while he was in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer.

*Gruenwald v. Advanced Computer Applications, Inc.*, 730 A.2d 1004, 1012–13 (Pa.Super.1999). The court below found that Skier proved all elements. *See* Conclusions of Law at 1–2. Appellants argue that, because all of the material in question was easily obtainable, it did not constitute a trade secret, and thus did not meet the first element.

¶ 16 First, "[c]ustomer information in particular may be subject to such

protection." *Bell Fuel Corp. v. Cattolico*, 375 Pa.Super. 238, 544 A.2d 450, 460 (1988). Whether such information is protected depends upon the circumstances of its creation. We have previously held that:

"[i]n many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information *which have been compiled by such firms* represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a non-disclosure contract."

*Robinson Elec. Supervisory Co. v. Johnson*, 397 Pa. 268, 154 A.2d 494, 496 (1959) (emphasis added) (quoting *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 842 (1957)); *see also Bell Fuel Corp.*, 544 A.2d at 460 (stating that "[w]here the information is not a particular secret belonging to the employer, developed through its efforts or investment, and of value to the continuation of the employer's business, no protection is afforded"). Various Skier employees compiled the client directory over many years at great expense and effort. The other information in question (the files and the 177 documents) contained confidential information such as premiums, payroll analysis, and handwritten notes as to the pros and cons of insuring each camp. Again, Skier employees obtained such information for Skier, with great expense, time, and effort. Appellants' argument that a collection of easily obtainable information is not a trade secret is simply incorrect. Skier employees put time and effort into creating the directory. The fact that Gold could reconstruct that collection with lots of effort does not mean that the collection was not a trade secret. Thus, Skier met the first element.

¶ 17 Skier also met the last three elements. The court below found that Gold stole a client directory consisting of client names, contact information, and expiration dates, 177 documents containing information on Mr. Skier's personal clients, and various folders containing confidential information regarding different accounts. *See* Findings of Fact at 2–3. This information was highly confidential, as evidenced by the fact that it was password protected. Further, Skier's employee handbook contained a provision that such information was owned by Skier. Thus, the court below did not abuse its discretion in protecting that information.

¶ 18 Appellants next argue that the court below erred by prohibiting Gold from contacting all of Skier's clients. First, they claim that not all client information was present in the materials Gold misappropriated. Appellants state that neither the 177 documents nor the missing files contained information about all of Skier's clients. In doing so, appellants ignore the client directory, which contained all of Skier's clients. Thus, the court below appropriately enjoined appellants from soliciting any of Skier's clients.

¶ 19 Second, appellants state that Gold did not sign a no-compete agreement and is thus able to compete freely with Skier. Appellants claim that this injunction keeps him from doing so and cite numerous cases referring to an employee's right to compete. The issue here, however, is not whether appellants can compete, but rather whether they can compete unfairly using information Gold stole from Skier. Because appellants now have the benefit of the information misappropriated from Skier, they now cannot compete fairly. Thus, the court below properly enjoined them from using Skier's information to compete with Skier. Appellants' fourth claim is thus without merit.

¶ 20 Appellants next claim that the court below erred in treating the preliminary hearing as a final hearing on the merits. They argue that the court treated this as a final hearing on the merits in two respects: first, the court ordered an accounting, and the very presence of an accounting means that the hearing is a final one; and second, that the court below made findings of fact and conclusions of law that Gold did indeed steal the documents. Before we address appellants' claims, however, we address appellee's claim that we are without the jurisdiction to entertain the accounting issue.

¶ 21 Appellee argues that an accounting order is interlocutory and appealable only by permission. *See* appellee's brief at 28. In doing so, appellee ignores *Levin v. Barish,* where a panel of this Court wrote, "[w]e ... agree that an appeal from an order directing an accounting must normally be quashed when no petition has been filed in the lower court for permission to take such an appeal.... However, the order appealed from in this case goes beyond simply directing an accounting, granting relief in the form of a *reviewable preliminary injunction." Levin v. Barish,* 314 Pa.Super. 347, 460 A.2d 1174, 1177 (1983) (emphasis added), *aff'd in part, rev'd in part,* 505 Pa. 514, 481 A.2d 1183 (1984). Here, the court below ordered a preliminary injunction, and thus *Levin* dictates that we can hear the appeal. Therefore, we now address appellants' claims.

¶ 22 Appellants cite Pa.R.C.P. 1530 for support of their proposition that a court cannot order an accounting after ordering a preliminary injunction. Appellants cite the rule in its entirety, *see* appellants' brief at 44, but nowhere do they indicate which section of the rule supports this proposition. A close reading of the rule reveals no limiting language as to its application to preliminary injunction proceedings.[1]

---

1. Pa.R.C.P. 1530 states:
   (a) Any pleading demanding relief may include a demand for an accounting.

   (b) If the party is entitled to an accounting the court may proceed forthwith to hear and determine the amount due or may en-

¶ 23 Nor do appellants guide us with relevant case law. They instead rely on a volume of Standard Pennsylvania Practice. They cite this volume to say that "[a]n action for accounting in equity previously required two distinct steps." 14 Std. Pa. Prac.2d, Accounting, § 81:25 (1996). Appellants utterly ignore the word "previously" in that passage, instead choosing to focus on the two distinct steps. *See* appellants' brief at 45. Nor do appellants explain the rest of § 81:25, which states that, "if [the court determines] that a party is entitled to an accounting in an equity action, the court may proceed forthwith to hear and determine the amount due *or the court may enter a decree that an account be filed.*" 14 Std. Pa. Prac.2d, Accounting, § 81:25 (1996) (emphasis added).

¶ 24 We turn now to the admittedly sparse case law regarding accountings. First, we have previously affirmed a court's order of an accounting when it ordered a preliminary injunction. *See Levin*, 460 A.2d at 1177. Also, in *Rock v. Pyle*, we stated that "[a]n equitable accounting is improper where no fiduciary relationship exists between the parties, no fraud or misrepresentation is alleged, the accounts are not mutual or complicated, or the plaintiff possesses an adequate remedy at law." *Rock v. Pyle*, 720 A.2d 137, 142 (Pa.Super.1998) (citations omitted). Here, the accounts are both mutual and complicated, and Skier does not possess an adequate remedy at law. Thus, we hold that the court below did not err in ordering an accounting while ordering a preliminary injunction.

¶ 25 Appellants also claim that the court below made too many factual findings, *i.e.,* the court decided that appellants were guilty. The court below had to find facts and state conclusions of law, though, in making its decision. The standard for a preliminary injunction is that plaintiff is entitled to "clear relief." To examine whether Skier was entitled to clear relief, the court below had to determine the facts of the situation. Therefore, appellants' fifth argument fails.

¶ 26 Lastly, appellants argue that the court below "misapplied the law" by directing Gold to file an accounting because Skier failed to provide evidence that Gold or Sobel had actually used the information to solicit accounts. *See* appellants' brief at 46. Appellants cite no case law for their proposition. We do note, however, that it does not matter whether appellants have used the information, but rather "whether there is sufficient likelihood, or substantial threat, of [appellants] doing so in the future." *Den–Tal–Ez, Inc. v. Siemens Capital Corp.*, 389 Pa.Super. 219, 566 A.2d 1214, 1232 (1989) (*en banc*). Here, there is a substantial threat that appellants will use the information in the future. Thus, the court below did not err.

¶ 27 Order affirmed.

---

ter a decree that an account be filed within such time as the court by local rule or special order shall direct.

(c) Each party shall be served with a copy of the account in the same manner as a pleading. Exceptions may be filed to the account within twenty days after service.

(d) If no exceptions are filed, the court shall enter judgment for the amount, if any, shown by the account to be due. If exceptions are filed, the court shall determine the amount due of may refer the account and exceptions to an auditor.

(e) The auditor shall file a report, to which exceptions may be filed within twenty days.

Pa.R.C.P. 1530.