**Labor & Logistics Management Inc. v. Wallover**

*Douglas L. Smillie,* and *Jay H. Karsch,* for plaintiff.
*Thomas Martin,* for defendant.

RUFE, J., *J.,* April 18, 2005—The defendants, David Wallover and Winner Logistics Inc., have served upon us a notice of appeal to the Pennsylvania Superior Court relating to rulings made in our January 24, 2005 order. In particular, the defendants challenge our decision imposing an injunction as a result of finding certain documents and information obtained by the defendants constitute misappropriated trade secrets. We offer this opinion as an explanation of our decision.

Plaintiff, Labor & Logistics Management Inc., is a New Jersey corporation in the business of providing contract truck drivers to its customers. Labor & Logistics' customers are typically companies who do not employ truck drivers themselves or companies that need additional or replacement truck drivers to satisfy their business needs. Labor & Logistics has 10 offices in seven states to accommodate customer requirements.[1] At each location, Labor & Logistics employs a location and driver manager to oversee the day-to-day operations of the business.[2]

In September of 2000, plaintiff hired David Wallover as a driver lease manager for their Delanco, New Jersey

---

1. N.T., 12/13/2004 trial at 13.
2. N.T., 12/13/2004 trial at 14.

location. The terms of Wallover's employment were outlined in a standard offer letter dated September 21, 2000.[3] The offer letter explained that Wallover's employment would be governed by an employment agreement that was discussed during the interview process with Curtis Ball, the founder and president of Labor & Logistics. At trial, Ball testified that he explained to Wallover that all management employees were required to sign an employment contract that contained nonsolicitation, noncompetition and noninterference covenants.[4] Specifically, the agreement barred employees from competing with Labor & Logistics within a 50-mile radius of its Delanco, New Jersey office for a period of two years. Ball also stated no driver lease manager was ever hired without signing the agreement and that Wallover did not object to the covenants.[5]

While at Labor & Logistics, Wallover had access to the company's customer lists, prospective customer lists and driver lists.[6] According to Ball, these lists are the products of "years of soliciting and interacting" with present and prospective customers. He described the lists as difficult to obtain outside of Labor & Logistics and constitute more than mere name and phone number compilations. Ball explained that the lists include sales histories, products customers typically shipped, pricing data, names of competitors and other information that would assist a driver in transporting a specific customer's

---

3. See 12/13/2004 trial exhibit P-2.
4. N.T., 12/13/2004 trial at 18-20; plaintiff's trial memorandum at 2.
5. N.T., 12/13/2004 trial at 20.
6. See generally, 12/13/2004 trial exhibits P-3, P-4 and P-5.

goods.[7] After gaining employment as a driver lease manager, Labor & Logistics provided Wallover access to a copy of the list to use in the course of his employment.

To protect the privacy and confidentiality of the lists, Labor & Logistics requires employees with access to the lists to sign noncompete and nonsolicitation covenants. As a further safeguard, only the territorially relevant customer list is maintained at each location; the master list is kept only in the Labor & Logistics corporate office.[8] In addition, the list is preserved on a password-protected computer at each location[9] and any hard copies of the list are to be maintained in a locked cabinet.[10]

In the early summer of 2002, Robert Latronica, an employee of Labor & Logistics, conducted a routine review of personnel records. At that time, Latronica informed Ball that a signed noncompete agreement was missing from Wallover's personnel file; he also reported that Wallover's was the only personnel file missing the noncompete agreement. As corporate records indicated Wallover had in fact signed the agreement, Ball instructed Latronica to review the file again.[11] Two days later, Latronica informed Ball that Wallover's file did not contain the agreement. Ball then told Latronica to have Wallover sign another agreement. Despite several requests by management of Labor & Logistics, including

---

7. N.T., 12/13/2004 trial at 23; plaintiff's trial memorandum at 2.

8. N.T., 12/13/2004 trial at 22.

9. N.T., 12/13/2004 trial at 22.

10. N.T., 12/13/2004 trial at 26.

11. Testimony at the 12/13/2004 trial indicated that no Labor & Logistics employee recalls presenting Wallover with a noncompete agreement or witnessing him sign one. N.T., 12/13/2004 trial at 103-104.

Ball himself, Wallover refused to sign an agreement. At that time, on July 31, 2003, Labor & Logistics terminated Wallover for refusing to sign the agreement and requested all confidential information be returned.

In the month after Wallover was terminated from Labor & Logistics, Curt Roble incorporated Winner Logistics, a company in the same business as Labor & Logistics, *i.e.,* the leasing of commercial truck drivers. Prior to the incorporation of Winner Logistics, Roble had no experience in the day-to-day operations or management of a truck-driver leasing company.[12] The person who provided the knowledge to begin the business was Wallover, the only other Winner Logistics' employee besides Roble at that time. Wallover drafted all the necessary forms, including the driver service agreement, owner/operator agreement, waiver and release agreement, and other marketing documents used in the contract truck-driver industry. Some of these documents were virtually identical to agreements Wallover had in his possession while employed at Labor & Logistics.[13] Wallover also provided the pricing information so that Winner Logistics could set a "competitive rate" for its services.[14]

As Winner Logistics had no customers and Roble had little or no knowledge of the industry, the solicitation of customers became Wallover's responsibility. Among others, Wallover began contacting businesses that he serviced while an employee of Labor & Logistics. At the time of the December 13, 2004 trial, Winner Logistics had approximately 15 customers. Of these customers,

---

12. N.T., 12/13/2004 trial at 114-18.
13. N.T., 12/13/2004 trial at 121-23.
14. N.T. 12/13/2004 trial at 119.

no less than 10 or 11 were customers with Labor & Logistics during the course of Wallover's employment.[15] Similar to Labor & Logistics, Winner Logistics maintained these customer names within a password-protected computer database so that the information would not be disclosed to competitors.[16]

As a result of Wallover and Winner Logistics' solicitation, Labor & Logistics estimates they suffered a 10 to 15 percent loss of business.[17] On December 2, 2002, Labor & Logistics filed the instant equity action against Wallover and Winner Logistics seeking injunctive relief and damages. The complaint alleges Wallover breached the restrictive covenants in his employment contract and misappropriated trade secrets by soliciting businesses from Labor & Logistics' customer list. After the pleading and discovery phase concluded, we held a trial on the merits on December 13, 2004. At trial, we heard evidence regarding Wallover and Winner Logistics' alleged liability relating to the misappropriation of trade secrets and Wallover's breach of restrictive covenants contained in his employment contract. We did not hear evidence to determine the existence of any damages, leaving the issue of damages to be decided on a subsequent date.

---

15. N.T., 02/04/2004 argument at 17.

16. N.T., 12/13/2004 trial at 177.

At trial the following testimony was elicited from Wallover:

"Court: Isn't it true you protect your customer and driver information because you don't want it released to competitors?

"A: That is a simple statement but I guess so, yes . . .

"Court: For whatever advantage it gives you, you don't wish to give any information you have to your competitors, do you?

"A: No."

17. N.T., 02/04/2005 argument at 17.

At the end of the trial, the parties agreed to submit briefs and we took the matter under advisement. On January 24, 2005, we issued the following findings of fact and order:

"From the evidence presented at the hearing on December 13, 2004, we make the following:

"Findings of Fact

"(1) Defendant David Wallover never executed a written contract of employment with plaintiff Labor and Logistics Management Inc. (LLM) and never agreed orally not to compete with LLM in the event of his termination of employment with LLM.

"(2) Defendant David Wallover is not prohibited by written or oral contract from engaging in business in direct competition with plaintiff.

"(3) Notwithstanding the absence of a contract of employment, defendant Wallover was subject to a common-law duty not to violate plaintiff's rights to the security and confidentiality of its trade secrets.

"(4) Plaintiff's customer lists were developed over a period of time through the collection of bits of information from a variety of sources. The customer lists, therefore, constitute trade secrets.

"(5) Defendants are hereby prohibited from initiating any contact with any of plaintiff's customers such as they existed on July 31, 2002.

"(6) Other forms and documents wholly or substantially copied or duplicated from plaintiff's forms and documents do not constitute trade secrets subject to employee confidentiality, as the same were easily obtainable in the open market or could be easily created.

"Accordingly, we enter the following

"Order

"And now, January 24, 2005, defendants are enjoined and prohibited from having any contact with such of plaintiff's customers as existed on July 31, 2002, for a period of two years from the date of this order."

On January 29, 2005, Wallover and Winner Logistics filed for an emergency motion for reconsideration of our January 24, 2005 order and, in the alternative, a motion for a stay pending appeal. We heard argument on February 4, 2005, and denied the motion for reconsideration and the motion for stay pending appeal.[18] Subsequently, we received Wallover and Winner Logistics' notice of appeal.

In their concise statement of matters complained of on appeal, Wallover and Winner Logistics complain that our January 24, 2005 order is not supported by sufficient evidence to find that Labor & Logistics' customer list constituted a trade secret and that such information was misappropriated. Wallover and Winner also argue the issuance of an injunction in this case is an error as a matter of law because: (1) Labor & Logistics presented no evidence that an injunction was necessary to prevent irreparable harm; (2) Labor & Logistics' delay in bringing this matter to the court for disposition conclusively establishes there is no immediate irreparable harm being suffered; (3) that the injunction we issued is overbroad and would prevent Winner Logistics from engaging in lawful competitive activity; (4) the injunction is contrary to

18. N.T., 02/04/2005 argument at 26-29.

public interest and would prevent non-parties from exercising their right to make a choice regarding what company supplies services to them; (5) the injunction is contrary to the court's finding that Wallover is not subject to any contractual restrictions on his right to compete and that Wallover did not utilize any of Labor & Logistics' trade secrets in the conduct of their business; (6) the injunction is contrary to the public policy of this Commonwealth; and (7) there is no evidence to support an injunction against Winner Logistics. We now discuss the contentions outlined in the defendants' appeal to the Superior Court.

## TRADE SECRETS

Defendants first argue that we erred in finding that Labor & Logistics' customer list constitutes a trade secret. Pennsylvania courts have generally adopted the definition of a trade secret as provided by section 757 of the Restatement of Torts. *Tyson Metal Products Inc. v. McCann,* 376 Pa. Super. 461, 465, 546 A.2d 119, 121 (1988). Section 757 states that a trade secret "consist[s] of any formula, pattern, device or compilation of information which is in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers." Restatement of Torts §757, comment b (1939).

When making a determination as to whether information should be protected as a trade secret, courts have considered the following: "(1) the extent to which the

information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Tyson Metal Products,* 376 Pa. Super. at 465, 546 A.2d at 121.

Although the concept of a trade secret is a nebulous one that requires a case-by-case analysis of the facts presented, courts of the Commonwealth have determined that customer lists warrant protection as trade secrets. *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957); *O.D. Anderson Inc. v. Cricks,* 815 A.2d 1063, 1072-73 (Pa. Super. 2003); *A. M. Skier Agency Inc. v. Gold,* 747 A.2d 936 (Pa. Super. 2000).

In *Morgan's Home Equipment,* our Supreme Court explained why certain customer lists are protected as trade secrets.

"In many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a nondisclosure contract, either under the law of agency or under the law of unfair

trade practices." *Morgan's Home Equipment,* 390 Pa. at 623, 136 A.2d at 842. (footnote omitted)

Moreover, there seems to be little significance, if any, as to whether the information from the customer list is utilized from the former employee's memory or from a wrongfully obtained physical list; either way, courts have held the information was entitled to protection. *Renee Beauty Salons Inc. v. Blose-Venable,* 438 Pa. Super. 601, 603, 652 A.2d 1345, 1346 (1995).

Since the decision to protect information as a trade secret is made on a case-by-case basis, a brief summary of the relevant case law is helpful. In *Morgan's Home Equipment,* our Supreme Court upheld an injunction against former employees of a company engaged in the door-to-door selling of household products. Upon gaining employment with the company, the employees were given a confidential list of customers to whom they would sell products and from whom they would collect weekly payments. After resigning from Morgan's, several employees began a rival company and solicited their former customers. In enjoining the former employees from soliciting their former customers, the Supreme Court stated that the customer lists were confidential, particular secrets of Morgan's, and thus, warranted protection as a trade secret. *Morgan's Home Equipment,* 390 Pa. 618, 136 A.2d 838 (1957).

In *Colteryahn Dairy Inc. v. Schneider Dairy,* 415 Pa. 276, 203 A.2d 469 (1964), the issue was whether a former employee of a milk delivery company could be enjoined from soliciting former customers. Our Supreme Court focused on the relationship of the employee with the customer when determining if a customer list deserved

protection as a trade secret. The court considered important the natural attrition of customers in the dairy delivery business and that it was the drivers who were responsible for maintaining their dairy routes by establishing personal relationships with their customers. In declining to provide the customer list trade secret protection, the court found one of the most important factors in retaining a customer was the "personality and resourcefulness" of the delivery driver, not the time and effort of the employer to compile the list. *Id.*

Similar to *Colteryahn Dairy,* the court in *Renee Beauty Salons,* 438 Pa. Super. 601, 652 A.2d 1345 (1995), distinguished *Morgan's Home Equipment* by focusing on the nature of the employee/customer relationship and held that the customer list of a particular beauty salon did not constitute a trade secret. There, a number of employees left their employer and began a competing salon. Soon thereafter, the former employees began soliciting customers they serviced while employed by their former employer. The court stated that in a business such as beauty salons, "intense relationships and loyalty to the service provider[s] often develop. As such, customers naturally will follow the employee to the new employer, rather than remain customers of the former employer." *Id.* at 609, 652 A.2d at 1349. The court also noted that it was an encouraged practice for salons to encourage new employees to solicit their former customers. Presented with these facts, the court refused to protect the customer list as a trade secret and stated, "[a]n injunction will not make Renee patrons of those who desire to go elsewhere." *Id.* at 609, 652 A.2d at 1349.

More recently, the Superior Court in *O.D. Anderson,* 815 A.2d 1063 (Pa. Super. 2003), heard a matter in which a tour bus company sought to enjoin a former employee from soliciting their potential "repeat" customers. The customer list in question contained not only the names, telephone numbers and addresses of former customers, but also the previous travel dates and destinations of those customers. With such information, the customer list became an important part of the company's "repeat" business. In upholding the injunction, the court noted the list contained more than mere names of customers and held the confidential manner in which the compilation was maintained and its value to the company allowed for the information to be shielded as a trade secret. *Id.*

Turning to the present matter, the record establishes that Labor & Logistics' customer list is compiled with confidential and valuable information. As in *O.D. Anderson,* the data contained not only the names, addresses and telephone numbers of customers, but also included more particular information regarding each customer. The list included sales histories, products those customers typically shipped, pricing data, names of competitors and other information that would assist a driver in transporting a specific customer's goods. Moreover, the data on the list was not readily obtainable by the public.

Testimony revealed that, although a competitor could potentially obtain similar information, it would take substantial effort to do so. The list was the product of "years of soliciting and interacting" with present and prospective customers. As Labor & Logistics engaged in business transactions with a client, employees upgraded the

company customer list by entering data into labeled fields of a spreadsheet. The information was entered to provide more efficient future service to customers and to assist Labor & Logistics drivers in their delivery routes.

In addition, the safeguards taken by Labor & Logistics to protect the information provides further evidence of its value. To keep the list confidential, only employees who signed the noncompete and nonsolicitation covenants were provided access to the list. When not being used, employees were told to store the list in a locked cabinet drawer. All copies of the list stored on computers were password-protected and the master list was maintained at corporate headquarters to prevent any of the particular office managers from having access to the entirety of Labor & Logistics' customer information. In fact, Curt Roble, the founder of Winner Logistics, testified that he considers his own customer list—the majority of which is comprised of former Labor & Logistics' customers—confidential. As they consider the information confidential, Winner Logistics also maintains their list on a password-protected computer. These safeguards were implemented at Winner Logistics, as indicated by Wallover, to prevent the information from being obtained by competitors. Wallover suggested that if the list were not kept confidential, Winner Logistics may lose an advantage over their competitors.[19] Finally, Labor & Logistics took the unusual step of terminating the services of Wallover only when it was discovered it did not have a noncompete covenant signed by him and that he refused its request to have him execute such a covenant.

---

19. N.T., 12/13/2004 trial at 177.

Considering the evidence presented, we also believe the instant case is easily distinguishable from *Colteryahn Dairy* and *Renee Beauty Salons.* In those cases the courts focused on the intimate nature of the employee/customer relationship when determining the customer lists were not protectable trade secrets. Here, such a close relationship was not shown to exist. No evidence was presented that the "personality and resourcefulness" of Wallover allowed Labor & Logistics to retain customers; nor was there testimony regarding the existence of an "intense relationship . . . [or] loyalty" between Wallover and customers. As such, we believe the facts of this matter closely resemble that of *O.D. Anderson,* and find the customer list warrants protection as a trade secret as it is not just "a list of customers, but a collection of information about the customers over an extended period of time" that is valuable and confidential to the business of Labor & Logistics.[20]

## MISAPPROPRIATION OF THE CUSTOMER LIST

Defendants further claim that, even if the information compiled in Labor & Logistics' customer list constituted a trade secret, there was insufficient evidence to find that either Wallover or Winner Logistics misappropriated that protected information. The necessary criterion to establish a claim for misappropriation of trade secrets is well established. *Van Products Co. v. General Welding and Fabricating Co.,* 419 Pa. 248, 259, 213 A.2d 769, 775 (1965). To establish this claim, the employer must demonstrate: "(1) [the existence of] a trade secret . . . ; (2)

---

20. N.T., 02/04/2005 argument at 26.

that it was of value to [him] and important in the conduct of his business; (3) that by reason of discovery of ownership [he] had the right to the use and enjoyment of the [trade] secret; and (4) that the secret was communicated to the employee while he was in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer." *A. M. Skier Agency,* 747 A.2d at 940 (citing *Gruenwald v. Advanced Computer Applications Inc.,* 730 A.2d 1004, 1012-13 (Pa. Super. 1999); see also, *O.D. Anderson,* 815 A.2d at 1072.

As Labor & Logistics has already established the customer list is a protectable trade secret, it is clear from the record that the remaining criteria are also satisfied. First, it is undisputed that the customer list was important and of value to Labor & Logistics' business. Testimony reveals that the extensive data was compiled through years of solicitation and interacting with customers. To utilize this information, Labor & Logistics constructed a spreadsheet database with a variety of fields so that employees could enter customer data as it was obtained. The value and importance of the list is also demonstrated by the aforementioned methods used to safeguard it. As further support, Wallover admitted during his testimony that Winner Logistics protected their information to sustain an advantage over their competitors.[21] On the facts presented, it would be difficult to find the customer list was not important and valuable to Labor & Logistics.

---

21. N.T., 12/13/2004 trial at 177.

It is equally apparent that Labor & Logistics had a right to the use and enjoyment of the customer list. Compiled through interactions with clients and customers, Labor & Logistics' employees spent years developing the information on the list. As a product of these efforts, Labor & Logistics had a clear right to use the information. Likewise, it is undisputable that Wallover was in a position of trust while he worked at Labor & Logistics. Although we found no evidence that Wallover actually signed the nonsolicitation and noncompete clauses, his testimony reveals he knew that those employed in his position were required to sign the covenants. Moreover, Labor & Logistics provided Wallover a copy of the customer list. Wallover knew the list was to be protected and was only made available to employees in management positions. In view of this evidence, it is clear that the protected information was conveyed to Wallover while he was in a position of trust and that it would be inequitable for him and Winner Logistics to use this information to the prejudice of Labor & Logistics. Accordingly, we believe Wallover and Winner Logistics misappropriated Labor & Logistics' customer list.

## THE PERMANENT INJUNCTION

Defendants next argue that we erred in issuing a permanent injunction that prohibits them from contacting certain Labor & Logistics' customers for a period of two years. Although defendants make a laundry list of challenges relating to the issuance of the injunction, we will address all the issues as appealed to the Superior Court.

In order for a plaintiff to prevail in an action seeking a permanent injunction, he must establish a "clear right to

relief." *Wellspan Health v. Bayliss M.D.*, 2005 WL 407523, *2 (Pa. Super. 2005) (citing *Buffalo Township v. Jones*, 571 Pa. 637, 644, 813 A.2d 659, 663 (2002)). Unlike a claim for a preliminary injunction, *a party seeking a permanent injunction does not need to establish either irreparable harm or the need for immediate relief. Buffalo Township*, 571 Pa. at 644, 813 A.2d at 663; *Wellspan Health*, 2005 WL at *2. Instead, a plaintiff must demonstrate that an "actual and substantial injury has occurred and/or is threatened in the future." *Wellspan Health*, 2005 WL at *2; *Peugeot Motors of America Inc. v. Stout*, 310 Pa. Super. 412, 425, 456 A.2d 1002, 1008 (1983). Where such an injury has been established, a court may properly issue a permanent injunction if such relief is necessary to prevent a legal wrong for which the law provides no adequate remedy. *Buffalo Township*, 571 Pa. at 644, 813 A.2d at 663; *Wellspan Health*, 2005 WL at *2; *Soja v. Factoryville Sportsmen's Club*, 361 Pa. Super. 473, 479, 522 A.2d 1129, 1131 (1987).

In their first two challenges, defendants argue there was insufficient evidence to establish that an injunction was necessary to prevent immediate and irreparable harm. Here, as the italicized language above indicates, immediate and irreparable harm is a required showing of a plaintiff seeking a temporary injunction, not a permanent injunction. In order to obtain the injunction, Labor & Logistics needed to prove an actual or substantial injury had occurred or would be threatened in the future. Although this issue was not appealed and is thus waived, we note that Labor & Logistics has shown an actual injury that has occurred and that is threatened to occur in the future. Labor & Logistics claims to already have lost

10 to 15 percent of their business due to the solicitations of Winner Logistics.[22] This clearly establishes an actual injury that has already occurred. Moreover, if Winner Logistics was not enjoined from contacting companies from the customer list, Labor & Logistics' loss of business profits could continue and possibly be exacerbated through further solicitation. Because this continued loss of revenue threatens the economic vitality of Labor & Logistics, we found the law provides no adequate remedy for these prospective injuries and issued the injunction.

We next turn to defendants' contention that the injunction issued by this court is overbroad and would prevent defendants from engaging in lawful activity. An examination of Pennsylvania case law offers little guidance as to the appropriate scope of an injunction. Nevertheless, the Superior Court has held it is entirely within the discretion of the trial court to determine the proper scope of an injunction. *Christopher M's Hand Poured Fudge Inc. v. Hennon,* 699 A.2d 1272, 1277 (Pa. Super. 1997). At a minimum, "trade secret injunctions . . . [should be] 'broad enough to ensure that the information is protected.' " *Id.* (citing *ST Handling Systems Inc. v. Heisley,* 753 F.2d 1244, 1265 (3d Cir. 1985)).

As explained at the February 4, 2005 oral argument on defendants' motion for reconsideration, we believe our injunction to be relatively narrow. In our order dated January 24, 2005, we enjoined defendants from having any contact with Labor & Logistics' customers as existed on July 31, 2002, for a period of two years. The

---

22. N.T., 02/04/2005 argument at 17.

order did not enjoin defendants from soliciting Labor & Logistics' prospective or non-customers; nor did it impose any geographic limitations on Winner Logistics' business. The only restriction was for Winner Logistics to cease any contact with Labor & Logistics' customers that existed on July 31, 2002. As such, we believe the scope of the injunction was minimally expansive to ensure that the information from the customer list was protected. In addition, we are confused by the argument that the injunction prevents defendants from engaging in lawful competitive activity. The only reason the injunction was issued was to remedy defendants' wrongful misappropriation of Labor & Logistics' customer list. Thus, defendants' wrongful activity renders the argument meritless.

Defendants also argue the injunction is contrary to the public interest as it will prevent non-parties to this litigation from exercising their right to make a choice regarding what company supplies them services. The instant injunction was issued to protect Labor & Logistics from the unfair competition of Winner Logistics stemming from the wrongful usurpation of protected information. Although the economic principles of free trade are a concern in any trade secrets case, it is not the only consideration. We found the misappropriation of valuable and confidential Labor & Logistics' information outweighed the concerns of a customer's right to make a choice regarding which company supplies them services. In reaching this decision, it is important to note that there is no evidence that Labor & Logistics holds a monopoly on the truck-driver leasing business. Therefore, as our order does not enjoin third parties from seeking the services of truck-driver leasing companies other than Win-

ner Logistics, we fail to see how our order is contrary to the public interest.

Defendant also maintains the injunction is contrary to our finding that Wallover is not subject to any contractual restrictions on his right to compete and that defendants have not utilized any of Labor & Logistics' trade secrets in the conduct of their business. Initially, it is true that we did not find Wallover was subject to any contractual restrictions relating to his right to compete or solicit.

We did find, however, that Wallover was subject to a common-law duty not to violate Labor & Logistics' right to the security and confidentiality of its trade secrets—the customer list. In offering such a challenge, it seems that defendant has not completely read our findings, does not understand them or believes that a common-law duty of confidentiality does not exist.[23] Either way, we believe defendant is mistaken. Moreover, as to defendants' claim that we did not find the trade secrets were misappropriated, we must concede such finding is not explicitly stated in our memorandum opinion and order. Notwithstanding, we believe the findings of fact clearly imply that defendants misappropriated the customer list.

Defendants next argue that the injunction is "contrary to the public policy of this Commonwealth." We believe this concise statement is too vague to address on appeal. When a party is ordered to file a concise statement of

---

23. If defendant contends the latter, *Morgan's Home Equipment* and its progeny clearly establish otherwise. 390 Pa. at 624, 136 A.2d at 842 ("The duty of the servant not to disclose the secrets of the master may arise from an express contract, *or it may be implied from their confidential relations.*").

matters complained of on appeal, the failure to file a statement results in a waiver of all issues. *Commonwealth v. Lord,* 553 Pa. 415, 417-18, 719 A.2d 306, 308 (1998). Likewise, the filing of a vague statement "is the functional equivalent of filing no concise statement at all." *Commonwealth v. Dowling,* 778 A.2d 683, 687 (Pa. Super. 2001). Our Superior Court has stated:

"The trial court may not frame issues for an appellant, either by guessing or anticipating. . . . the appellate courts have emphasized that a trial court's unsolicited discussion of issues not raised by an appellant in his 1925(b) statement by guessing, anticipating, or predicting the issues would not save the issues from being waived." *Commonwealth v. Lemon,* 804 A.2d 34, 38 (Pa. Super. 2002).

In *Dowling,* the appellant made the following argument on appeal: "Did the trial court err and deprive the appellant from receiving a fair trial by prohibiting counsel from cross-examining the complainant with respect to matters impeaching his credibility?" The Superior Court determined the issue was waived as it lacked sufficient specificity to allow a trial court to address any issue on appeal. *Dowling,* 778 A.2d at 686.

When compared to *Dowling,* the concise statement filed here lacks the specificity to allow this court to properly identify or address the issue on appeal. Courts of the Commonwealth have identified many public policies to be considered by a trial court. The concise statement filed by defendants provides no guidance as to which policy the issuance of the injunction contradicts. Therefore, as it is improper for this court to guess or attempt to predict defendants' issues on appeal, this challenge to our ruling is waived.

Finally, defendants maintain that there was no evidence to support the issuance of an injunction against Winner Logistics. To enjoin Wallover from soliciting Labor & Logistics' customers, but not Winner Logistics, would defeat the purpose of the injunction. The facts established that Wallover, through his employment with Winner Logistics, misappropriated protected information by soliciting and doing business with Labor & Logistics' customers. As Labor & Logistics' former customers now contract with Winner Logistics, not Wallover himself, we fail to see any purpose in issuing an injunction that does not include Winner Logistics.[24] As such, we see no merit in defendants' appeal.

---

24. Pennsylvania courts have upheld injunctions barring a former employee and their new employer from utilizing protected customer lists. See *Morgan's Home Equipment,* 390 Pa. 618, 136 A.2d 838 (1957); *A. M. Skier Agency Inc. v. Gold,* 747 A.2d 936 (2000).