**James E. SHEPHERD, Appellee**

v.

**PITTSBURGH GLASS WORKS,
LLC, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 15, 2011.

Filed July 27, 2011.

Marguerite S. Walsh, Philadelphia, for appellant.

Suzanne L. DeWalt, Pittsburgh, for appellee.

BEFORE: BOWES, DONOHUE, and SHOGAN, JJ.

OPINION BY BOWES, J.:

Pittsburgh Glass Works, LLC ("PGW") appeals from the May 17, 2010 order enjoining it from enforcing a restrictive covenant and requiring Appellee, James Shepherd, to post bond in the amount of $2,000. We affirm.

On March 1, 2010, Appellee instituted this action and alleged the following in his complaint. In 1976, following his graduation from college, Appellee began working for PPG Industries, Inc. ("PPG") as an accountant. From 1976 to 1995, he was promoted in the accounting, finance, and

administration areas at PPG, and worked as director of managerial accounting of glass from 1989–1995. In 1995, Appellee was appointed director of the flat glass automotive products segment of PPG, and assumed responsibility for profit and loss for flat glass products sold to the automotive industry. In 2002, Appellee was promoted again and became general manager of PPG's OEM, which means original equipment manufacturer, glass business. In that job, Appellee was responsible for profit and loss of the business and participated in defining the overall strategic direction and operation of PPG's automotive OEM business segment. After twenty-five years of service, Appellee executed an agreement with PPG, a copy of which is attached to the complaint, that contained, *inter alia*, a restrictive covenant.

The covenant provided in pertinent part that Appellee could not accept employment with a competitor of PPG for two years after his service with PPG was terminated. The non-compete accord contained an arrangement whereby PPG could elect not to enforce its terms, but if it chose to do so, PPG agreed to pay Appellee his regular salary and bonus for the period of time that he was unable to work due to operation of the covenant not to compete. The parties have consistently referred to the payments mandated by the restrictive covenant as bench compensation. Appellee averred in the complaint that while he did receive a promotion and increase in salary around the time that the agreement was executed, he did not receive any other additional money for signing it.

Appellee also set forth the following. At the time the non-compete was signed, PPG had a standard severance policy applicable to employees with Appellee's level of responsibility. Pursuant to that severance policy, upon termination, Appellee was entitled to a lump-sum payment of two weeks of his base salary for every year of employment with PPG times eighty percent with a twelve-month cap. The severance package applied whether or not Appellee received bench compensation under the restrictive covenant.

In 2006, PPG's automotive glass and services business units had both manufacturing and service components. As a manufacturer, the unit was an original equipment manufacturer of windshields, sunroofs, side windows, and rear windows for the motor vehicle industry. It also supplied replacement glass. As a services provider, the unit oversaw a glass claims service called LYNX, and the unit also offered glass management and internet marketing services and provided e-business solutions to its customers.

In 2008, PPG decided to divest its automotive glass and services business to a new company formed by affiliates of Kohlberg & Co., LLC ("Kohlberg"). In that transaction, PPG retained an equity interest of approximately forty percent in the new company. In anticipation of the transaction, the automotive glass and services division was renamed PGW effective August 1, 2008. After the transaction in question, Kohlberg was to use that name for the division and Appellee's title was changed from General Manger of Automotive OEM to Vice President of Automotive OEM, but there was no appreciable change in his responsibilities.

Appellee set forth in his complaint that the written agreement governing the transaction with Kohlberg required PGW to maintain the severance package applicable to Appellee for twelve months from the effective date of the transaction, which was completed on or about September 30, 2008. On September 29, 2008, Appellee executed an agreement with PGW. In the September 29, 2008 document, Appellee agreed not to work for a competitor of PGW for

two years after his termination with PGW. Consistent with the earlier accord, PGW could waive the non-compete clause and, if PGW did decide to enforce it, it agreed to pay Appellee's salary plus a bonus for up to twenty-three months if Appellee demonstrated he was unable to secure a position comparable to the last position that he held at PGW. However, unlike the previous contract, the compensation payable under the 2008 document was reduced by the amount of any severance or salary continuation plan of PGW.

Thus, the September 2008 agreement reduced the amount of bench compensation payable for enforcement of the restrictive covenant from the earlier agreement by eliminating one month's salary and by reducing the amount PGW had to pay to enforce the agreement by the amount of any severance payments received by Appellee from PGW.

After the transaction involving Kohlberg was completed, Appellee had the same office and essentially the same responsibilities. Appellee did not receive a promotion, lump sum payment, or additional compensation for his entry into the September 29, 2008 agreement. On April 30, 2009, Appellee was terminated from employment with PGW without explanation by the chairperson and chief executive officer of PGW, James Wiggins. Appellee remained as a consultant with PGW through July 31, 2009 to ensure the orderly transition of his replacement.

The averments in the complaint continued as follows. Kevin Cooney, vice-president of human resources, gave Appellee a separation agreement and release, which Appellant executed, that provided Appellee with salary and medical benefits for eight months. Mr. Cooney allegedly told Appellee that he was not entitled to any severance pay and would not receive any severance if he did not execute that document.

This representation purportedly was false because, unbeknownst to Appellee at the time, under the documents governing the transaction involving Kohlberg, Appellee was entitled to the severance package that he had with PPG, which exceeded the severance package provided under the separation agreement and release with PGW. In addition, under the original PPG restrictive covenant, the amount of bench compensation was not reduced by any severance payments made to Appellee. In this separation agreement, Appellee released PGW from any obligations under any employment agreements.

After Appellee searched for a job for six months, he was offered a position as executive vice president of Central Glass American ("CGA"), the North American subsidiary of Central Glass Co., Ltd. ("Central Glass"), a Japanese corporation. Appellee averred in the complaint that even though CGA had an OEM glass unit, it was not a direct competitor of PGW and had no common customers with PGW. He further averred that he did not possess any confidential knowledge or information about PGW. After receiving the job offer, on November 5, 2009, Appellee sent an electronic mail to PGW describing his job responsibilities at CGA and asking for confirmation that the job would not trigger the September 29, 2008 restrictive covenant. On November 23, 2009, PGW informed Appellee that it intended to enforce the two-year restrictive covenant in the September 29, 2008 accord. In return, Appellee asked for the bench compensation payments and also substantiated his inability to locate comparable employment.

On January 24, 2010, Appellee attempted to again convince PGW that the job at CGA did not trigger the restrictive covenant, but PGW declined to change its position. PGW also refused to tender the bench compensation payments required by

the September 29, 2008 contract and informed Appellee that due to the separation agreement and release, that it was not obligated to make any payments despite its decision to enforce the September 29, 2008 restrictive covenant.

In the complaint, Appellee sought damages, a declaratory judgment that the September 29, 2008 restrictive covenant was unenforceable, and an injunction preventing its enforcement. A hearing on the injunction request was held on April 22, 2010. Appellee testified as follows. He joined PPG Industries in 1976, after graduating from college with a degree in accounting. In 2002, he became general manager of PPG's OEM glass business. OEM is an industry designation for when a supplier provides a product or component directly to the motor vehicle manufacturer, and when Appellee assumed that position, he retained his previous responsibility over the segment of PPG involved in flat glass automotive products and also assumed OEM general management. As noted in the complaint, in connection with that advancement, Appellee executed the August 12, 2002 employment agreement, which contained a non-disclosure agreement and the non-compete provision, which was enforced through the payment of bench compensation. The business unit in question produced and sold primarily glass products for the automotive industry, including windshields, sunroofs, and rear and side windows.

In 2008, due to prevailing economic conditions, there was a significant reduction in the demand for automobiles. PPG decided to leave the automotive glass business, and Kohlberg, a private equity firm, was the successful buyer. In September 2008, PGW was created, and PGW was owned approximately forty percent by PPG and sixty percent by entities owned by Kohlberg. In connection with the Kohlberg transaction, Appellee executed the September 29, 2008 employee agreement. Appellee was not given additional consideration for signing the agreement, and even though there was a change in his title, Appellee did not assume additional responsibilities after the Kohlberg transaction.

After September 2008, Appellee's primary responsibility was cost reduction, but he was not aware of Kohlberg's ultimate strategy when it acquired controlling interest in PGW. On April 30, 2009, he was terminated by PGW. When he asked his supervisor, Mr. Wiggins, the reasons for the firing, Mr. Wiggins responded, "I don't want to get into that." N.T. Hearing, 4/22/10, at 40. Appellee was told that his replacement was in the building.

On July 16, 2009, Appellee executed the release and separation agreement with PGW. At that time, he was informed that if he did not execute that document, he would not receive any severance. Unbeknownst to Appellee, under the terms of the transaction with Kohlberg, which was submitted as an exhibit at the hearing, PGW was required to pay certain employees, including Appellee, the same severance package that they enjoyed with PPG, if the employee was terminated within a year of the transaction. Appellee was terminated within a year, and the July 16, 2009 agreement provided Appellee with less severance than he was entitled to receive under the PPG severance plan.

Following his termination, Appellee sought help with an organization specializing in transition services and devoted thirty to forty-five hours to a nationwide job search. He experienced a great deal of difficulty securing a job due to the downsizing in the automotive business and his age, fifty-six. Appellee related, "one of the terms that I came across in the process, they can look for and find a 'purple squirrel,' which, that was new to me. I

mean, I've learned a lot in the last year. The proverbial purple squirrel. They can find exactly what they want, and if you don't have all those attributes," you will not be hired. *Id.* at 50–51.

Appellee received one job offer from Central Glass, a Japanese company headquartered in Tokyo. Central Glass owns Carlex, which is involved in the automotive OEM glass business. However, Appellee did not believe that Carlex was a competitor with PGW because "Carlex was one of my customers" in that "Carlex purchased automotive flat glass from PPG and then PGW." *Id.* at 54. Appellee continued that he would be irreparably harmed if he could not assume the position with Carlex. "I have been in the job search for close to a year now. This is the only option I've had." *Id.* at 93. Appellee noted that there was a significant number of very qualified individuals looking for the same positions as he had been seeking. He delineated, "I am the purple squirrel" for the job at Carlex. *Id.* at 94. He described the job as the chance of a lifetime.

At the hearing, Appellee outlined his responsibilities and knowledge of PGW's trade secrets and confidential information. Certain individuals in Appellee's unit had a close association with the vehicle manufacturers because the glass for new vehicles had to be designed contemporaneously with the vehicle. However, Appellee was far removed from new product development and engineering design. The position directly under Appellee's control was the director of new product development and emerging technologies, and the individual occupying that position was responsible for coordinating the research. Appellee was not involved at PGW with the development of any new proprietary technology and did not participate in the development or creation of any new glass

creation processes. *Id.* at 87. Other employees were responsible for new business opportunities but Appellee was also removed from that activity. Appellee explained that any knowledge that he had of products being sold by PGW and their profit margin and cost structure was obsolete because bidding occurs two to three years before the glass is made. This latter fact was confirmed by testimony from Mr. Wiggins.

Appellee further stated that his responsibilities at Carlex were to strategically review Central Glass's American operations and that he absolutely would not be using any proprietary or confidential information of PGW in connection with his job responsibilities with Carlex. *Id.* at 65. Appellee represented, "First of all, I—I can't do that; I wouldn't do that. And second of all, it wouldn't be necessary." *Id.* at 65–66. Appellee explained that potential customers were publicly known and that glass in the vehicles could be readily examined by purchasing one.

Appellee complied with the terms of the non-competition agreement by notifying Central Glass of its existence. He related the job offer to PGW and was surprised to learn that PGW took the position that Central Glass was a competitor and would enforce the restrictive covenant. When Appellee requested the bench compensation payable under the terms of the restrictive covenant, PGW instructed him that while the restrictive covenant was enforceable, PGW was not required to pay the bench compensation because it was released under the severance agreement executed by Appellee.

 After the hearing, the trial court issued a preliminary injunction preventing PGW from enforcing the covenant, and

this appeal followed.[1]

To obtain a preliminary injunction, a petitioner must establish that: (1) relief is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by money damages; (2) greater injury will occur from refusing to grant the injunction than from granting it; (3) the injunction will restore the parties to their status quo as it existed before the alleged wrongful conduct; (4) the petitioner is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and (6) the public interest will not be harmed if the injunction is granted. *See Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.,* 573 Pa. 637, 646–47, 828 A.2d 995, 1001 (2003). Appellate courts review a trial court order refusing or granting a preliminary injunction for an abuse of discretion. *See id.* at 645, 828 A.2d at 1000. This standard is applied as follows:

On an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the Chancellor.

*Roberts v. Bd. of Dirs. of Sch. Dist. of Scranton,* 462 Pa. 464, 469, 341 A.2d 475, 478 (1975), *quoted in Summit Towne Ctr.,* 573 Pa. at 645–46, 828 A.2d at 1000. *Brayman Construction Corp. v. Pennsylvania Department of Transportation,* 13 A.3d 925, 935–936 (Pa.2011).

An injunction can be either preventative or mandatory in nature. *Overland Enterprise, Inc. v. Gladstone Partners, LP,* 950 A.2d 1015 (Pa.Super.2008). "While the purpose of all injunctions is to preserve the *status quo,* prohibitory injunctions do this by forbidding an act or acts while mandatory injunctions command the performance of some specific act that will maintain the relationship between the parties." *Ambrogi v. Reber,* 932 A.2d 969, 974 (Pa.Super.2007). Thus, preventative injunctions maintain the present status of the parties to the litigation by barring any action until the litigants' rights are adjudicated on the merits. *Overland Enterprise, Inc. supra.* Mandatory injunctions require the performance of a positive action to preserve the *status quo,* are subject to greater scrutiny, and must be issued more cautiously than preventative injunctions. *Id.* Since the present injunction does not require either party to take an affirmative action and simply maintains the present status quo, it is not mandatory in nature and not subject to a heightened standard of review. Accordingly, Appellee merely had to establish that he is likely to succeed on the merits of his position that the non-competition covenant was unenforceable and did not have to prove that he had a clear right to relief. *Id.*

In this case, PGW challenges the grant of the injunction on the following grounds:

A. Did the trial court err by implicitly finding that the non-competition provision contained in Mr. Shepherd's Employee Agreement is not reasonably designed to protect PGW's legitimate interests, without undertaking the analysis required under Pennsylvania law and instead

---

1. Pa.R.A.P. 311(a)(4) confers an appeal as of right from an interlocutory order granting a request for an injunction.

misapplying and improperly extending the narrow holding of *Insulation Corp. of America v. Brobston,* 446 Pa.Super. 520, 667 A.2d 729 (1995) in a manner that effectively eviscerates the rights of employers in this Commonwealth? (Yes)

B. Did the trial court err by finding that Mr. Shepherd proved that he would not inevitably disclose trade secrets if he accepted employment with Central Glass? (Yes)

C. Did the trial court err by finding that Mr. Shepherd proved that he would suffer irreparable harm if PGW were not enjoined from enforcing the non-competition agreement and that the balancing of harms favors him? (Yes)

D. Did the trial court err by relying as a basis for relief upon the purely contractual (and disputed) issue of whether the underlying agreements between the parties require PGW to pay Mr. Shepherd both "bench compensation" and severance benefits in order to enforce the non-competition provision, where the parties agreed on the record that the scope of the hearing would not include this issue? (Yes)

PGW's brief at 5.

PGW's first two issues relate to whether the restrictive covenant is valid and implicate the question of whether Appellee likely will prevail on the merits of his position in this lawsuit that the restrictive covenant is unenforceable. Its third averment pertains to whether the trial court correctly balanced the respective interests and whether it concluded that Appellee will suffer irreparable harm if the injunction were not granted. PGW's final position is that the question of whether it is contractually obligated to pay bench compensation should not have been a factor in the trial court's decision to issue the preliminary injunction. We have concluded that this last contention relates to the question of whether the covenant is supported by consideration. A restrictive covenant that is not buoyed by consideration is unenforceable; thus, the fourth allegation presented on appeal actually is also related, as are the first two, to the likelihood that Appellee will prevail on the merits, and we address PGW's final contention first.

PGW claims that the trial court improperly examined the bench compensation issue because the parties agreed to defer resolution of that issue to the merits of the underlying claims of breach of contract and declaratory relief. PGW also avers, "At this stage of the litigation, it was improper for the trial court to assess the purely contractual issue of monies owed to Appellee under the operative agreements." PGW's brief at 35. It maintains that the question of whether Appellee "is entitled to bench compensation is an ultimate issue in this case and has no bearing on whether his restrictive covenant was reasonable." *Id.* at 37.

Initially, we disagree with PGW's assertion that Appellee agreed that the bench compensation question was irrelevant for purposes of the preliminary injunction. Appellee stated at the hearing that it was not an issue as to whether he was to be paid that compensation. This fact indeed was not an issue because PGW was and remains steadfast in its position that Appellee is not entitled to such compensation. Appellee also acknowledged that the calculation of the amount of bench compensation that he was owed could be deferred.

However, at the hearing, Appellee specifically stated that whether the bench compensation actually was paid **was** a factor in determining the enforceability of the restrictive covenant. N.T. Hearing,

4/22/10, at 3–4. Additionally, in his trial court brief in support of his request for preliminary injunction, Appellee maintained that payment of the bench compensation was the only and the required consideration for the restrictive covenant. Thus, Appellee clearly articulated that PGW's insistence that it did not have to pay the only consideration, *i.e.*, the bench compensation, underlying the restrictive covenant rendered it unenforceable. Further, he never stated that the question of consideration was not relevant for purposes of issuance of the preliminary injunction.

We also disagree with PGW's position that the question of its payment of bench compensation is immaterial at this stage of the proceedings. PGW's refusal to pay the bench compensation relates directly to the question of whether the restrictive covenant was supported by consideration. Our review of the record indicates that the payment of bench compensation may well be, in accordance with Appellee's position, the only and the required consideration that sustains the restrictive covenant. Thus, the bench compensation issue directly impacts on the question of whether Appellee is likely to prevail on the merits of the litigation.

■ In leveling this particular argument, PGW insists that the restrictive covenant is enforceable because it is reasonable. However, reasonableness is merely one aspect of the validity of such accords. The law provides that a restrictive covenant, regardless of whether it is reasonable, will not be enforced if no consideration was exchanged for its execution. *E.g., Insulation Corp. of America v. Brobston*, 446 Pa.Super. 520, 667 A.2d 729 (1995). PGW acknowledges as much on page nineteen of its brief. This precept is simply a matter of basic contract law in that no agreement is enforceable absent the existence of consideration. *Greene v. Oliver Realty, Inc.*, 363 Pa.Super. 534, 526 A.2d 1192, 1194 (1987) ("Contemporary contract law generally provides that a contract is enforceable when the parties reach mutual agreement, exchange consideration and have outlined the terms of their bargain with sufficient clarity.").

■ Whether the restrictive covenant is sustained by consideration is crucial to whether it is enforceable; Appellee maintained that the payment of bench consideration was the only and the required consideration for the non-compete. This position was supported by the record, which indicates that he received no additional compensation, salary, lump sum payment, or training from PGW in return for signing it. Indeed, Appellee testified that, looking at the "total compensation" that he received following the Kohlberg transaction, "I would characterize [bench compensation payable under the PGW non-compete] as a reduction from what was available under the PPG compensation program." N.T. Hearing, 4/22/10, at 30. The consideration question is inexorably intertwined at this stage of the proceeding with Appellee's ultimate chances of prevailing. Hence, the payment of bench compensation was relevant to the non-compete's validity, and the trial court properly considered PGW's position that it did not have to pay bench compensation but still could enforce the contract.

Furthermore, the record indicates that the question of whether the restrictive covenant is supported by consideration will be a significant contention as this litigation proceeds to the merits. PGW argues that Appellee released it from paying the bench compensation in the separation agreement. However, there is an issue as to whether the severance accord itself was lacking in consideration because that document granted Appellee less severance than he

was contractually entitled to receive under the documents governing the PPG/Kohlberg transaction and was purportedly procured by misrepresentations. Thus, we have concluded that PGW's failure to pay the bench compensation was a proper factor in the trial court's analysis and a cause for concern as to the covenant's validity.

 We now address PGW's remaining challenges to the trial court's determination that Appellee will most likely be successful voiding the restrictive covenant.

Restrictive covenants, of which non-disclosure and non-competition covenants are the most frequently utilized, are commonly relied upon by employers to shield their protectable business interests. The non-disclosure covenant limits the dissemination of proprietary information by a former employee, while the non-competition covenant precludes the former employee from competing with his prior employer for a specified period of time and within a precise geographic area. In Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent. Our law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer. However, restrictive covenants are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living.

*Hess v. Gebhard & Co.*, 570 Pa. 148, 808 A.2d 912, 917 (2002) (citations and quotation marks omitted). Thus, the "presence of a legitimate, protectable business inter-est of the employer is a threshold requirement for an enforceable non-competition covenant." *WellSpan Health v. Bayliss*, 869 A.2d 990, 997 (Pa.Super.2005).

 Herein, PGW assails the trial court's conclusion that the "covenant not to compete is not reasonably designed to protect PGW's legitimate business interests." PGW's brief at 19. In this connection, it argues that the trial court "erred by concluding that [Appellee] demonstrated that he would not inevitably disclose PGW's trade secrets and confidential information." Appellant's brief at 26. The kinds of business interests that are considered legitimate and protectable under a restrictive covenant include trade secrets and confidential information, as well as other items. *Hess, supra; WellSpan Health, supra.* Herein, PGW proffered that the non-competition agreement is necessary to protect its trade secrets and confidential information.

 In Pennsylvania, we utilize the definition of trade secrets contained in Restatement (Second) of Torts § 757, *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1070 (Pa.Super.2003), which states at comment b:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

 "The crucial indicia for determining whether certain information constitutes a trade secret are 'substantial secrecy and competitive value to the owner.' " *O.D. Anderson, Inc., supra*, at 1070 (par-

tially quoting Restatement (Second) of Torts § 757, comment b.). The question of whether information is a trade secret is determined on a case-by-case basis and can include confidential customer lists. *Id.* Additionally, a trade secret can involve "a compilation of information which is used in one's business" that gives one "an opportunity to obtain an advantage over competitors." *WellSpan Health, supra* at 997 (partially quoting *Christopher M's Hand Poured Fudge, Inc. v. Hennon,* 699 A.2d 1272, 1275 (Pa.Super.1997)). "A trade secret does not include an employee's aptitude, skill, dexterity, manual and mental ability, or other subjective knowledge. In addition, if a competitor could obtain the information by legitimate means, it will not be given injunctive protection as a trade secret." *WellSpan Health, supra* at 997 (citations omitted).

■ At the hearing, Appellee delineated that he was not privy to research and development, and any confidential information regarding pricing that he did possess is stale due to the lapse between bids and sale and the fact that PGW's customers are a matter of public record. Herein, the trial court's conclusion that Appellee will not reveal trade secrets or confidential information from PGW is supported by Appellee's testimony. Our decision to affirm the trial court's conclusion that Appellee will not reveal trade secrets or confidential information rests firmly upon our standard of review of the factual findings of the preliminary injunction court, as follows.

In *A.M. Skier Agency, Inc. v. Gold,* 747 A.2d 936, 939 (Pa.Super.2000), the appellant claimed that the prevailing party failed to prove a fact relied upon by the trial court when it issued a preliminary injunction. We observed that the factual finding in question was supported by the testimony of witnesses. We stated, "The judge below saw the demeanor of the witnesses; all we can do is read the record. Thus, we will not disturb the court's credibility determinations without good reason. There is no reason to do so here." *Id.* at 939 (citation omitted). In the preliminary injunction context, we have further observed that if the evidence supports a trial court's factual finding, we will conclude that there are apparently reasonable grounds for that determination. *See Ambrogi v. Reber, supra* at 976. Finally, in connection with the factual findings made by a court deciding whether to issue a permanent injunction, we have specifically ruled that we are bound by those findings and "must accord them the weight of a jury verdict where supported by competent evidence." *Judge Technical Services, Inc. v. Clancy,* 813 A.2d 879, 891 (Pa.Super.2002) (quoting *Temple University v. Allegheny Health Education and Research Foundation,* 456 Pa.Super. 314, 690 A.2d 712, 718 (1997)).

Herein, there was conflicting evidence on the question of whether Appellee would reveal trade secrets and confidential information to his new employer; Mr. Wiggins maintained that Appellee necessarily would reveal such data, but Appellee insisted that he would not. The trial court found Appellee's testimony credible. We are required to accept this credibility determination. *Sovereign Bank v. Valentino,* 914 A.2d 415, 420 (Pa.Super.2006) ("assessments of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgment for that of the factfinder.").

PGW notes that the trial court incorrectly stated that it "did not offer any tangible evidence or testimony to suggest that [Appellee] possessed any confidential information which would inevitably fall into the

hands of Central Glass...." Trial Court Opinion, 8/4/10, at 17. It argues that this statement demonstrates that the trial court completely overlooked Mr. Wiggins's testimony indicating that Appellee would have to reveal confidential information if he begins to work for Central Glass. However, the trial court's statement about evidence was prefaced with the adjective "tangible," which means documentary or other physical proof, which was not submitted.

Further, the court twice referenced and acknowledged Appellant's countervailing evidence on this issue. *Id.* at 17, 18. The trial court simply chose to credit Appellee's testimony that his knowledge of margins and cost structure was stale, that he had no knowledge of manufacturing and research data, that car manufacturers are not secret, and that he would not reveal confidential information during his tenure at Central Glass. Appellee's testimony was credited. Thus, the record supports the trial court's conclusion in this respect, and the cases relied upon by Appellant are simply inapposite.

 In connection with its conclusion that the restrictive covenant was unnecessary to protect the business interest of PGW, the trial court also focused on the fact that PGW terminated Appellee for no reason and had his replacement in the building at the time of termination. PGW assails this reliance and suggests that Appellee's termination was the sole basis for the trial court's finding that the restrictive covenant did not protect any legitimate business interest that it had. It is clear that a restrictive covenant can be enforced even if an employee is terminated by an employer, and the fact that an employee was fired without reason, standing alone, will not prevent a non-compete from being upheld. *Missett v. Hub Intern. Pennsylvania, LLC*, 6 A.3d 530 (Pa.Super.2010).

 On the other hand, it is equally clear that the fact that an employee is terminated without cause is a factor that can be considered in determining whether enforcement of a non-compete advances the employer's business interest. *Brobston, supra.* The reasoning is as follows:

> Where an employee is terminated by his employer on the grounds that he has failed to promote the employer's legitimate business interests, it clearly suggests an implicit decision on the part of the employer that its business interests are best promoted without the employee in its service. Such an employer deems the employee worthless. Once such a determination is made by the employer, the need to protect itself from the former employee is diminished by the fact that the employee's worth to the corporation is presumably insignificant.

*Missett, supra* at 538 (quoting *Brobston, supra* at 735).

In the present case, we cannot agree with Appellant's premise that the trial court's conclusion regarding the validity of the non-compete rested solely upon Appellee's termination. As noted above, the trial court expressed concern about the non-payment of bench compensation, which Appellee argued was the sole and necessary consideration for the restrictive covenant. Furthermore, the trial court concluded that Appellee would not reveal trade secrets and confidential information, which was the only business interest that Appellant proffered as in need of protection through enforcement of the restrictive covenant. The firing was undoubtedly a factor in the trial court's decision; however, it was not the sole factor. Thus, the trial court herein did not offend our holding in *Missett.*

 In this respect, we stress that at the preliminary injunction stage, it is nec-

essary for the prevailing party to demonstrate a likelihood that he will obtain a favorable ruling on the merits of the controversy and not that he will, in fact, ultimately win. *Ambrogi, supra* at 976 ("the party seeking an injunction is not required to prove that he will prevail on his theory of liability, but only that there are substantial legal questions that the trial court must resolve to determine the rights of the parties"). That fact was demonstrated in this case by the problematic issue of consideration and by the trial court's evidentiary finding that PGW had no legitimate business interest to protect in enforcing the covenant both because it fired Appellee and because he would reveal neither confidential information nor trade secrets in his new position.

■ The final contentions we must address are that the trial court erred in finding that Appellee proved that he would suffer irreparable harm if PGW were not enjoined from enforcing the non-compete and that the court misapplied the law when it considered the relative harms at issue herein. We first consider the latter position. As we noted in *WellSpan Health, supra* at 999,

> If the threshold requirement of a protectable business interest is met, the next step in analysis of a non-competition covenant is to apply the balancing test defined by our Supreme Court. *Hess, supra* at 163, 808 A.2d at 920. First, the court balances the employer's protectable business interest against the employee's interest in earning a living. Then, the court balances the employer and employee interests with the interests of the public. *Id.*

■ In this case, the court concluded that Appellant had no legitimate interest to be protected by enforcement of the restrictive covenant while Appellee needed to earn a living. Thus, the balancing test was not incorrectly applied.

■ Furthermore, the record supports the trial court's determination that Appellee will suffer irreparable harm if the non-compete were to be enforced. When offered the job in question, Appellee had been searching for employment for nearly a year, he was in his late fifties, the job market was abysmal, and employers were hiring only individuals who precisely fit their needs, *i.e.*, the purple squirrel. Appellee stated that he was the proverbial purple squirrel for the job with Central Glass and that the job was the chance of a lifetime. Thus, Appellee's credited testimony fully supports that he will not be able to find a comparable job for the remainder of his life and will suffer irreparable harm if he cannot assume that position. Having rejected Appellant's challenges to the trial court's decision, we affirm.

Order affirmed.