**Acero Precision v. Bonelli**

418

C.P. of Chester County, No. 2014-05245

*Thomas G. Wolpert*, for plaintiff.
*John Guernsey*, for defendants.

TUNNELL, *J.*, Oct. 15, 2014—On April 1, 2014, James Bonelli resigned as a manufacturing engineer machinist for Acero Precision and went to work for Vistek Medical, Inc., a company which competes with Acero in some aspects of the medical device industry.

Acero brought this action to enforce a non-competition covenant. It filed a complaint for breach of contract and other claims. It also sought preliminary and permanent injunctive relief.

Preliminary injunction hearings were held in September 2014. By stipulation, the parties agreed that these would constitute the final hearing on the merits as to all claims. For the reasons discussed herein, the court finds in favor of defendants and against Acero on all claims, denies Acero's request for permanent injunctive relief, and awards attorneys' fees to Bonelli.

Findings of Fact

1. Plaintiff, Acero Precision ("Acero"), and defendant, Vistek Medical, Inc. ("Vistek"), are both contract manufacturers.

2. A contract manufacturer fabricates a part on behalf of an original equipment manufacturer ("OEM") pursuant to the OEM's specifications. (*See* N.T. 9/9, 25-26 (J. Miller).)

3. Acero manufactures and machines parts for the automotive, industrial, analytical, and medical industries. (*See* N.T. 9/8, 28 (M. Fitzgerald).)

4. Vistek primarily manufactures and machines parts for the medical device industry. (N.T. 9/8, 139 (J. Miller).)

5. The manufacturing process for medical devices must meet the standards of the International Standards Organization ("ISO"). ISO standards assure control quality. ISO requirements are not confidential or proprietary. (N.T. 9/8, 83-84 (M. Fitzgerald).)

6. Defendant, James Bonelli ("Bonelli"), has over twenty years of experience as a machinist, engineer, and manager in the manufacturing and machining industry with specialized experience as a computer numeric control ("CNC") machinist using both Star and Citizen brand Swiss machines. (P-13.)

7. A Swiss machine is a machine that combines the capabilities of both mills and lathes. Star and Citizen are the two main brands of Swiss machines.

8. From approximately November 2010 to April 2014, Bonelli was employed by Acero.

9. Bonelli has been employed by Vistek since April 2014.

10. Just prior to his employment at Acero, Bonelli was employed in western Pennsylvania as an operations manager at Smart Parts, an OEM sports equipment manufacturer, where he oversaw thirty-five Swiss machines and sixty employees. Bonelli was forced to relocate and find new employment when Smart Parts effectively ended operations after declaring bankruptcy. (P-13; N.T. 9/8, 163-64 (J. Bonelli).)

Bonelli's Employment At Acero

11. In November 2010, Bonelli accepted conditional employment at Acero as a Manufacturing Engineer Technician in Newtown Square. (N.T. 9/8, 42 (M. Fitzgerald); 118 (D. Watson); 165 (J. Bonelli).)

12. Bonelli was then hired in 2010 as a full-time employee after successfully completing his trial period and relocated to West Chester, Pennsylvania for his new position. (N.T. 9/8, 42 (M. Fitzgerald), 119 (D. Watson).)

13. Acero provided Bonelli with no formal training; he had to learn on-the-job. (N.T. 9/8, 93 (M. Fitzgerald).)

14. As part of the hiring process, Bonelli was required to sign a restrictive covenant agreement entitled "Employment Agreement/Relating to Confidential Information, Trade Secrets and Non-Competition" (the "2010 agreement") and dated November 30, 2010. (N.T. 9/8, 167-68 (J. Bonelli).)

15. The 2010 agreement contained the following non-competition provision:

During the period of two (2) years following the date of termination of the employee's term of employment with the employer, the employee without the express

prior written consent of employer will not compete in any way with the employer directly or indirectly, and will not consult with or have any interest in any business, firm, person, partnership, corporation or any other entity, whether as employee, officer, director, agent, security holder, creditor, consultant or otherwise, which engaged in the performance of or provides services to any individual or entity or which competes with employer directly or indirectly, in any aspect of the business of employer at any location within one hundred (100) miles of any location or geographical area which shall have been designated in writing by employer as the Principal Place of Assignment of the employee at any time within the last two (2) years of the employee's term of employment with employer.

(P-2.)

16. The one hundred mile non-compete radius from Acero's locations in Newtown Square and West Chester, PA includes such cities as Philadelphia, Harrisburg, Allentown, Scranton, Wilmington, DE, Trenton, NJ, Newark, NJ, New York, NY, and Baltimore, MD.

17. Thus, under this provision, Bonelli would be prevented from being employed in the manufacturing industry for two (2) years after separating from Acero unless he relocated beyond the geographic restriction.

18. The 2010 agreement also contains non-disclosure of confidential information and non-solicitation of Acero customers covenants. (*Id.*)

19. At Acero, Bonelli led a manufacturing group of eight (8) Star brand Swiss machines and oversaw approximately four (4) to eight (8) machinists contained within the group

from time to time. (N.T. 9/8, 91 (M. Fitzgerald); 119 (D. Watson).)

20. Bonelli was also responsible for operating one (1) to two (2) of those machines at a time. (N.T. 9/8, 91 (M. Fitzgerald); 120 (D. Watson).)

21. Bonelli and his group were responsible for determining how to fabricate a customer's product pursuant to the customer's specifications articulated on a shop drawing. (N.T. 9/8, 119, 121 (D. Watson).)

22. Although Bonelli provided time estimates to develop projected manufacturing costs, Bonelli was not responsible for either sales or pricing at Acero. (N.T. 9/8, 114 (M. Fitzgerald); 131 (D. Watson); 169-70 (J. Bonelli).)

23. Bonelli was eventually given the title of "Manufacturing Engineering Manager," however, his core job functions remained the same. (N.T. 9/8, 119 (M. Fitzgerald).)

24. Bonelli expressed interest in acting as a training manager, a position that was discussed with Acero but never created for him. (N.T. 9/8, 97 (M. Fitzgerald).)

25. In addition, Bonelli expressed interest in the open position of manufacturing manager in charge of Swiss machining, however, Acero did not promote him to that position, which still remains open. (N.T. 9/8, 97-98 (M. Fitzgerald).)

26. Throughout his time at Acero, Bonelli's direct supervisor was long-time Acero employee Dave Watson, Director of Operations. (N.T. 9/8, 117-18 (D. Watson).)

Acero revises its Employee Handbook and requires all employees to sign a new Restrictive Covenant Agreement.

27. During the fall of 2013, Acero contracted with an outside human resources ("HR") company, McCloskey Partners ("McCloskey"), to outsource its HR functions and revise its Employee Handbook (the "Handbook"). (D-60 at 8 (J. Fitzgerald); P-19 at 17-20, 27 (H. McCloskey).)

28. Acero had multiple versions of restrictive covenants on file for employees, and some employees had no agreement on file at all. Acero wanted its employees to have one uniform agreement to protect against employee resignations. (D-60 at 15-16 (J. Fitzgerald); P-19 at 76 — 77, 80-82, 105-06 (H. McCloskey).)

29. Thus, as part of the Handbook revision process, Acero directed McCloskey to include a new restrictive covenant agreement in the Handbook and as a separate agreement. (N.T. 9/8, 103-04 (M. Fitzgerald); D-60 at 17, 19-20 (J. Fitzgerald); P-19 at 82-86 (H. McCloskey).)

30. Around December 2013, the Handbook was finalized and distributed to Acero managers, including Bonelli, in a meeting conducted by McCloskey. (N.T. 9/8, 127-28 (D. Watson); 9/9, 68-69 (J. Bonelli); P-19 at 40-41, 47 (H. McCloskey).)

31. Acero directed the managers to have their direct reports sign an acknowledgement of receipt of the Handbook. (N.T. 9/8, 126-29 (D. Watson); D-60 at 8-9 (J. Fitzgerald).)

32. In January 2014, Acero held another meeting to present the revised Handbook to all its employees and required all employees to sign a two (2) page document to acknowledge their receipt and understanding of the Handbook. (N.T. 9/8, 126-29, 132 (D. Watson).)

33. At that time, Acero also directed its employees

to sign a separate document entitled a "Confidentiality, Non-Solicitation and Non-Competition Agreement" (the "2014 agreement") and return their signature pages. (N.T. 9/8, 125-29, 132-34, 137-38 (D. Watson); D-60 at 9 (J. Fitzgerald); P-19 at 99-100 (H. McCloskey).)

34. All 73 Acero employees signed the form of the 2014 agreement, including Mike Fitzgerald, President of Acero, and Dave Watson. (N.T. 9/8, 111 (M. Fitzgerald); 136 (D. Watson); 9/9, 54-55 (M. Fitzgerald); D-60 at 9, 14 (J. Fitzgerald).)

35. Acero retained the 2014 agreement signature pages for all 73 employees in hardcopy and electronically. (D-60 at 10-11 (J. Fitzgerald).)

36. The terms of the 2014 agreement are less restrictive to the employees as they relate to non-competition and the 2014 agreement even adds a term for payment. (P-7.)

37. The 2014 agreement provides in relevant part:

I agree that, notwithstanding anything herein to the contrary, upon termination for any reason other than "Bad Acts," of employee's employment with employer, the employer may, in its sole discretion and by delivery of written notice to employee within thirty (30) days after the time his/her employment is terminated, elect to continue to pay employee, for a period of up to one (1) year, his/her salary at the time of such termination, such payments to be made in accordance with employer's ordinary and usual payroll practices and procedures (the "non-compete pay"). It is understood however that employer may elect to discontinue such non-compete pay at any time prior to the end of the period initially elected by employer by written notice to the employee

no less than fourteen (14) days prior to discontinuation (e.g. if employer initially elects to continue payment for six (6) months but then after nine (9) months into the one (1) year period decides that it no longer desires to pay employee the non-compete pay, then it may elect at such time to discontinue the same with fourteen (14) days prior written notice to employee). The period during which non-compete pay is paid to employee hereunder shall be referred to herein as the "non-compete pay period." *In the event that the Employer elects not to pay Employee Non-Compete Pay, or in the event the Employer elects to discontinue Non-Compete Pay at any time during the Non-Compete period, then all "No Competition" covenants and restrictions in this Agreement shall no longer be enforceable against the Employee.* Employee acknowledges and agrees that: (i) employer has no obligation to pay him/her the non-compete pay; (ii) if employer elects to pay employee non-compete pay then the same is in exchange for the covenants given by employee under this agreement, and employee hereby reaffirms the same; (iii) any non-compete pay paid to employee hereunder will be based upon his/her annual base salary at the time of termination of employment (excluding any commissions, bonuses or other compensation); and (iv) in the event that employee breaches any term of this agreement during a non-compete pay period then, as a result of such breach, employer shall be entitled to discontinue, and/or off set against with respect to any damages incurred, any remaining payments of non-compete pay otherwise owed to employee during such non-compete pay period, however, employee's obligations during such non-compete pay period shall continue the same as if the non-compete pay continues

to be paid.

(P-7 (emphasis added).)

38. The 2014 agreement also provides: "Should the employer or employee file a claim and or lawsuit, the losing party will pay the other parties' attorney's fees." (P-7; N.T. 9/8, 103 (M. Fitzgerald).)

39. Bonelli signed and dated the Handbook receipt on January 6, 2014, to acknowledge his receipt and understanding of the Handbook and the policies contained therein. (P-6; N.T. 9/8, 133-34 (D. Watson); 9/9, 69-70 (J. Bonelli).)

40. He did not sign the 2014 agreement at that time. (N.T. 9/8, 178-79 (J. Bonelli); 9/9, 72 (J. Bonelli).)

41. His supervisor, Dave Watson, thereafter advised Bonelli to sign the January 2014 agreement on or about January 9, 2014. (N.T. 9/8, 134-35 (D. Watson); 179-80 (J. Bonelli); 9/9, 73 (J. Bonelli).)

42. He also directed Bonelli to obtain the signatures of two (2) of his direct reports who had not signed it. (N.T. 9/8, 134-35 (D. Watson); 180 (J. Bonelli); 9/9, 73 (J. Bonelli).)

43. Bonelli signed the 2014 agreement on January 9, 2014 and obtained his direct reports' signatures on their agreements. (P-7; N.T. 9/8, 129 (D. Watson); 9/9, 73-74 (J. Bonelli); D-60 at 14 (J. Fitzgerald).)

44. Upon review of the 2014 agreement, Bonelli saw that the non-competition restrictions contained in the 2010 agreement had been replaced with a new non-compete restriction that was contingent upon Acero's election to provide the employee with non-compete pay

and specifically disclaimed any non-compete restriction if the non-compete pay was not provided by Acero. (N.T. 9/9, 76-77 (J. Bonelli).)

Bonelli resigns from Acero to become director of operations at Vistek.

45. In March 2014, Vistek offered Bonelli an open operations manager position and after some routine negotiation, in April 2014, Bonelli resigned from Acero to accept the position of "director of operations" of Vistek, located in Ivyland, Bucks County. (N.T. 9/8, 150-51 (J. Miller).)

46. Bonelli had been contacted about the Vistek position in December 2013, by a recruiting agency, Global Recruiters of Fishers ("Global"), who received Bonelli's name and contact information from one of Bonelli's former coworkers. (N.T. 9/8, 181 (J. Bonelli); P-21 at 31 (M. Groves).)

47. Bonelli disclosed the existence of a restrictive covenant agreement to Global and provided a copy of the 2014 agreement when Global so requested. (N.T. 9/8, 175 (J. Bonelli); 9/9, 79 (J. Bonelli).)

48. Bonelli relied on the 2014 agreement during the interviewing and negotiation process with Vistek along with his decision to accept the Vistek position. (N.T. 9/9, 77 (J. Bonelli).)

49. At Vistek, Bonelli is responsible for all aspects of operations and oversees approximately 30-35 employees and 23-24 machines. (N.T. 9/8, 162 (J. Bonelli).)

50. Bonelli has no responsibility for programming the machines at Vistek. (N.T. 9/8, 163 (J. Bonelli).)

51. Bonelli does not handle new or experimental projects for Vistek. (N.T. 9/8, 163 (J. Bonelli).)

52. Bonelli has not assisted Vistek's programmers in solving manufacturing problems. (N.T. 9/8, 163 (J. Bonelli).)

53. Vistek uses different approaches to manufacturing than Acero. Although both Vistek and Acero manufacture medical devices, their operations and processes materially differ. For example, their machines (Star versus Citizen), software (Sponge versus Unipoint), manufacturing approaches (one machine versus multiple machines), and clients (only one mutual) essentially differ. (N.T. 9/8, 121 (D. Watson); 9/9, 63-64 (J. Bonelli).)

54. Vistek prefers to fabricate a product on multiple machines in the most efficient manner possible. (*See* N.T. 9/9, 20-23, 26-27 (J. Miller).)

55. Acero, however, prefers to manufacture a part using just one machine. (N.T. 9/8, 121 (D. Watson).)

56. Vistek uses Unipoint software as its electronic filing system, which contains all documents used during the manufacturing process, such as drawings, specifications, quality control, and FDA or ISO correspondence. (N.T. 9/9, 40-41 (J. Miller); 63 (J. Bonelli).)

57. Vistek also uses JobBoss, which is a business operations software that develops price quotes, estimates, invoices, billing, and also tracks payment. (N.T. 9/9, 41-42 (J. Miller).)

58. Acero does not use these software programs. (N.T. 9/8, 74 (M. Fitzgerald); 9/9, 64 (J. Bonelli).)

59. Because Bonelli had no experience with these

programs, he has been receiving training on the use of both Unipoint and JobBoss. (N.T. 9/9, 41-42 (J. Miller); 63 (J. Bonelli).)

60. In addition, Vistek uses a variety of CNC machines, such as Swiss, lathes, and milling machines, that differ from Acero's machines. (N.T. 9/9, 38 (J. Miller).)

61. For example, Vistek uses the Citizen brand Swiss machines. (N.T. 9/8, 173 (J. Bonelli); 9/9 38 (J. Miller).)

62. The operation and programming of Citizen brand Swiss machines materially differs from the operation and programming of Star brand Swiss machines, which are used by Acero. (N.T. 9/9, 38-39 (J. Miller).)

63. The machine controls between the different brands are entirely different. A program from a Star machine would not work on the Citizen machine because they are incompatible. (N.T. 9/9, 64-65 (J. Bonelli).)

64. Acero and Vistek have only one common client, Camber Spine ("Camber"), whose relationship with Vistek pre-dates Bonelli's employment at Vistek and continues because of a long-standing business relationship between the general manager of Vistek, Jeff Miller, and the president of Camber, Daniel Pontecorvo. (N.T. 9/9, 30-31, 36-38 (J. Miller).)

65. Bonelli never worked on the part produced by Acero for Camber. (N.T. 9/8, 79 (M. Fitzgerald).)

66. Vistek has taken proactive steps to ensure that Bonelli has no contact with Camber. (N.T. 9/9 38, 45 (J. Miller).)

67. Bonelli has not contacted any client of Acero since separating from Acero in April 2014, nor has he disclosed

any confidential information or trade secret of Acero to Vistek. (N.T. 9/9, 45 (J. Miller); 80 (J. Bonelli).)

68. Bonelli has never taken or disclosed the confidential information obtained from any employer to any subsequent employer. (N.T. 9/9, 62-63 (J. Bonelli).)

69. Acero has no evidence that Bonelli has taken or disclosed any of Acero's information to Vistek. (N.T. 9/8, 112-13 (M. Fitzgerald).)

70. Acero has no evidence that Bonelli has solicited any of Acero's customers or employees. (N.T. 9/8, 113 (M. Fitzgerald).)

71. Acero has no evidence that it has a suffered a loss of customer or business as a result of Bonelli's employment at Vistek. (N.T. 9/8, 78-79 (M. Fitzgerald).)

72. Acero has withdrawn with prejudice any and all claims for damages. (Stipulation, endorsed 9/19/2014.)

73. It would be an economic and personal hardship to Bonelli if he were precluded from working at Vistek. (N.T. 9/9, 189 (J. Bonelli).)

## Conclusions of Law

1. In order to establish a claim for a permanent injunction, Acero must establish its clear right to relief as to its claims in addition to harm for which there is no adequate redress at law.

2. Acero has failed to establish its clear right to relief as to its breach of contract claim, count I, because the 2014 agreement replaced the 2010 agreement, and under the 2014 agreement, Bonelli is not restricted by a non-compete covenant and has breached no provision therein.

3. Acero has failed to establish its clear right to relief as to its breach of the covenant of good faith and fair dealing claim, count II, which is not an independent cause of action and is subsumed within the aforementioned breach of contract claim.

4. Acero has failed to establish its clear right to relief as to its misappropriation of trade secret claim, count IV, because Acero did not establish that any legally protected trade secret was disclosed by Bonelli, or any improper knowledge of same by Vistek.

5. Acero has failed to establish harm it has incurred for which there is no adequate redress at law because it proffered no evidence of stolen customers, customer lists, or confidential information or loss of income.

6. Acero has failed to establish that it incurred harm that cannot be compensated at law.

7. Further, pursuant to the terms of the 2014 agreement, as the prevailing party, Bonelli's reasonable attorney's fees shall be paid by Acero, the losing party.

### Discussion

Plaintiff failed to establish a right to relief on either its breach of contract or trade secret claim; Bonelli has not violated the 2014 agreement and is entitled to attorney's fees thereunder.

For Acero to establish a cause of action for its breach of contract claim, it had to present evidence of (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Corestates Bank v. Cutillo*, 1999 PA Super 14, 723 A.2d 1053, 1058 (Pa. Super. 1999). Acero failed to

establish these elements in light of the 2014 agreement.

The evidence presented in plaintiff's case established that the January 9, 2014 Confidentiality, non-solicitation, and non-competition agreement between Acero and Bonelli was a valid, enforceable agreement and is the controlling agreement in this case. There is no doubt that Acero intended to replace its prior restrictive covenant agreements, including the 2010 agreement, with the terms of the 2014 agreement. The 2014 agreement, therefore, can be viewed as a novation. It replaces and renders unenforceable the 2010 agreement. Under the 2014 agreement, if Acero elects not to pay Bonelli the non-compete pay, Bonelli is not restrained by any non-competition covenant. Acero has not paid Bonelli the non-compete pay and thus Bonelli is not subject to a non-compete restriction. *See, e.g.*, *Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179, 193 (N.D.N.Y. 2005) (applying Pennsylvania law and finding earlier restrictive covenant unenforceable and replaced by later agreement); *Am. Pool. Mgmt. v. Queen*, 2013 Pa. Dist. & Cty. Dec. LEXIS 374 (C.C.P. Bucks Nov. 6, 2013) (subsequent restrictive covenant was novation and displaced earlier restrictive covenant), *aff'd by* No. 2544 EDA 2013 (Pa. Super. Ct. July 22, 2014)(upholding trial court's finding that subsequent restrictive covenant was novation).

In Pennsylvania, a novation, or substituted contract, is valid and enforceable where the evidence demonstrates "the displacement and extinction of a valid contract, the substitution for it of a valid new contract, . . . a sufficient legal consideration for the new contract, and the consent of the parties." *Buttonwood Farms, Inc. v. Carson*, 329 Pa. Super. 312, 317, 478 A.2d 484, 486 (1984). The party asserting a novation or substituted contract has the burden

of proving that the parties intended to discharge the earlier contract. *Id.* An intention to substitute a prior contract can be shown by "writings, or by words, or by conduct or by all three." *Id.* A novation extinguishes all rights and duties under the earlier agreement. *Id.*

Here, the 2014 agreement is a substitute for the previously valid November 2010 agreement because Acero intended that all of its employees be bound by the confidentiality, non-solicitation, and non-competition provisions of the 2014 agreement. As the testimony presented at the hearing demonstrated, Acero intended for the form of the 2014 agreement to replace prior restrictive covenant agreements, including the 2010 agreement. Mr. Fitzgerald testified that he was using a form of the 2014 agreement at Altus Spine, another manufacturing company for which he serves as managing partner, and that he directed McCloskey to utilize it at Acero. Heather McCloskey testified that Acero wanted to replace its prior forms of restrictive covenant agreements with one uniform agreement and ensure that all employees have a valid agreement on file. Pursuant to that goal, Ms. McCloskey testified that Mr. Fitzgerald directed her to include the form of the 2014 agreement in the revised employee Handbook *as well as* a separate agreement. In fact, in January 2014 and thereafter, Acero required all of its employees — including Mr. Fitzgerald himself — to sign the form of the 2014 agreement and Acero continues to maintain the signature pages to those agreements on file for all its employees.

That Acero intended the 2014 agreement to replace prior agreements including the 2010 agreement is also corroborated by both Joanne Fitzgerald, who presently oversees the HR functions at Acero, and Dave Watson,

director of operations at Acero. They both identified and relied on the agreement signed in January 2014 as the restrictive covenant agreement presently in effect. In fact, it was so important to Acero that Bonelli sign the 2014 agreement after Bonelli initially declined to sign it on January 6, 2014, that Mr. Watson went back to Bonelli on January 9, 2014, and advised him to sign it and further, to obtain the signatures of two (2) of his team members who, like him, had signed the receipt of Handbook form but not the signature back for the stand alone restrictive covenant agreement, the 2014 agreement. There can be no mistake that Acero intended to replace the 2010 agreement with the 2014 agreement.

The other legal requirements of a novation have also been fulfilled. In the context of restrictive covenants, a new or additional covenant "must be supported by new consideration which could be in the form of a corresponding benefit to the employee or a beneficial change in his employment status." *Davis & Warde, Inc. v. Tripodi*, 420 Pa. Super. 450, 455, 616 A.2d 1384, 1387 (1992). Here, the 2014 agreement was supported by adequate consideration in the form of more reasonable terms to the employee, Bonelli, which is a corresponding benefit to him in exchange for the new restrictive covenant.

The 2014 agreement reduced the burdensome scope of Acero's restrictions from an absolute two-year non-compete with a one hundred mile geographic radius of any direct or indirect competitor of any business of Acero, to a much more reasonable and favorable one-year non-compete with pay, which could only be invoked by Acero within thirty days of Bonelli's departure. (*Id.*) Not only does this reduction of restriction constitute valuable consideration, it fairly reflects the strictures

of Pennsylvania law and public policy which disfavor employee restrictive covenants and unquestionably favors an employee's right to gainful employment. (*Id.*)

Despite plaintiff's argument to the contrary, the lack of a formal signature by a representative of Acero on the 2014 agreement has no bearing on its validity or enforceability, because Bonelli, the party charged with performance, signed it. *See Herman v. Stern*, 419 Pa. 272, 213 A.2d 594 (1963) (upholding validity and enforceability of contract, noting that signature of promisee immaterial as agreement was signed by promisor, "the party to be charged, and his signature to that promise is sufficient."). Many agreements, such as promissory notes, options, or assignments are signed only by the party charged with performance, but are nevertheless enforceable against that party. In any event, as a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties. *See, e.g., Shovel Transfer & Storage v. Pa. Liquor Control Bd.*, 559 Pa. 56, 739 A.2d 133 (1998); *L.B. Foster Co. v. Tri-W Constr. Co., Inc.*, 409 Pa. 318, 186 A.2d 18, 19 (1962). The intent of the parties is determined by the contents of the agreement, *Shovel Transfer*, 559 Pa. at 67, 739 A.2d at 139, which contains no requirement that Acero's signature is necessary before the agreement is effective. "In the absence of such term, it is hornbook law that in determining the intent of the parties, ambiguities are to be construed against . . . the contract drafter [Acero]." *Id.*

The overwhelming weight of the evidence supports the court's finding that the 2014 agreement was intended to replace the 2010 agreement, was supported by adequate consideration in the form of a less restrictive non-compete covenant and was signed by the party charged

with performance, Bonelli. Although the 2014 agreement is valid and enforceable, plaintiff presented no evidence that it invoked the non-competition provision of the 2014 agreement by notifying Bonelli within thirty days of his departure and providing to Bonelli his salary in exchange for his noncompetition. Because no actionable conduct has occurred under the 2014 agreement, the court finds in favor of Bonelli and against Acero on the breach of contract claim.

Defendants also prevail on the misappropriation of trade secret claim. Misappropriation of trade secret occurs when one "discloses or uses another's trade secret, without a privilege to do so . . . if (a) he discovered the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him." Restatement (Second) of Torts § 757; *see Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 389 Pa. Super. 219, 566 A.2d 1214 (1989) (adopting section 757 of the restatement).

Acero's purported claim for breach of the Covenant of Good Faith and Fair Dealing (count II) is not an independent cause of action in Pennsylvania and is subsumed within the breach of contract claim.

Acero's claim that Bonelli breached a covenant of good faith and fair dealing contained in the 2010 agreement by "failing to refrain from competing with plaintiff Acero and by accepting employment with a direct competitor" is not actionable as an independent cause of action. An alleged breach of the covenant of good faith and fair dealing is a breach of contract. *See, e.g., Zaloga v. Provident Life & Accident Ins. Co.*, 671 F. Supp. 2d 623, 630-31 (M.D. Pa. 2009) (citing *Birth Ctr. v. St. Paul Cos.*, 567 Pa. 386,

787 A.2d 376, 385-86 (2001), *Gray v. Nationwide Mut. Ins. Co.,* 422 Pa. 500, 223 A.2d 8, 11 (1966). As such, it must be denied. Further, for the reasons discussed *supra,* Bonelli has not breached any covenant of good faith and fair dealing, nor would any such alleged breach be actionable.

Acero's claim for a preliminary and/or permanent injunction (count III) is denied.

Acero has brought a claim for a preliminary and/or permanent injunction as a separate cause of action in its complaint. Count III will be denied for the reasons discussed herein. As mentioned, the parties have agreed that this is a final order on the merits of all claims.

Acero presented no evidence of either a misappropriation or the existence of protectable trade secret (count IV).

Trade secret law in Pennsylvania is codified at 12 Pa. C.S. § 5301-5308, as part of the Uniform Trade Secrets Act (the "Act"), a model law based on section 757 of the Restatement (Second) of Torts. It defines "trade secret" as "a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process" that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 12 Pa. C.S. § 5302. A "misappropriation" is the "(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use

438

of a trade secret of another without express or implied consent." 12 Pa. C.S. § 5302.

"It is not the character of the information that is relevant under Pennsylvania law. Rather, the determination of whether the information is a trade secret must be made on a case-by-case basis." *O.D. Anderson, Inc. v. Cricks,* 2003 PA. Super. 13, 815 A.2d 1063, 1070-71 (2003) (citations and internal quotations omitted). The plaintiff bears the burden of establishing the existence of a trade secret. *Gilbert v. Otterson,* 379 Pa. Super. 481, 490, 550 A.2d 550, 555 (1988).

Plaintiff admits that it has no evidence of any disclosure or improper use of a trade secret. In fact, Mr. Fitzgerald conceded at the hearing that he had no evidence that Bonelli disclosed any trade secret or confidential information to Vistek. (N.T. 9/8, 112-13 (M. Fitzgerald).) Both Bonelli and Mr. Miller, on behalf of Vistek, confirmed that no such disclosure had or will occur. It is undisputed that no alleged trade secret has been misappropriated.

For that matter, Acero failed to identify the specific trade secrets allegedly at issue. Defendants contended that Acero has no trade secrets and the information Acero seeks to protect is simply confidential. The evidence at the hearing confirmed that Acero has no trade secrets at issue here and for this reason, Acero's claim for misappropriation of trade secrets also fails. Of the items and information discussed during Mr. Fitzgerald's examination and analyzed, *infra*, none constitute a trade secret as that term is defined under Pennsylvania law.

First, Acero's ISO certification is not a trade secret because it is a required process of documentation known and utilized within the industry. It is an international set

of standards and is in no way secret or specific to Acero.

Second, Acero's customers are not a trade secret, because the identities of its customers are not secret and are, in fact, advertised on the Acero website. Information known or developed by the employee that could be discoverable by legitimate means is not a trade secret, such as names of customers or a price list. *See Wellspan Health*, 2005 PA Super 76, 869 A.2d 990, 997 (2005); *Iron Age Corp. v. Dvorak*, 2005 PA Super 270, 880 A.2d 657, 661 (2005) (finding that confidential information at issue was "available to competitors through legitimate means and cannot be declared a trade secret."); *Renee Beauty Salons, Inc. v. Blose-Venable*, 438 Pa. Super. 601, 652 A.2d 1345, 1349 (1995); *Tyson Metal Prods, Inc. v. McCann*, 376 Pa. Super. 461, 546 A.2d 119, 122 (1988) ("Because the information sought to be kept secret could be discovered through legitimate channels (contacting the suppliers personally) by energetic, conscientious and eager members of the competition, we fail to discern how the prohibition of the disclosure of the identical data through [the employee] renders it trade secret information subject to protection by means of an injunction").

Third, Acero's pricing is not a trade secret because it could be discovered and is known by anyone who requests such information from Acero. In any event, Mr. Fitzgerald admitted Bonelli had no daily involvement with pricing and only provided costing information for projects.

Fourth, the "shop drawings," product specifications, or part numbers supplied by Acero customers, while certainly confidential and proprietary to that customer, are not a trade secret *of Acero's*.

Fifth, Acero's approach to production, referenced

in some of the emails presented at the hearing and discussed by Mr. Fitzgerald, is not a trade secret. An approach to production is a strategy — not a method or process for bringing about a result that provides Acero with a competitive advantage. As Mr. Miller explained, there are multiple approaches to fabricating a part using CNC manufacturing. Which "recipe" is used depends on the knowledge and creativity of the programmer, the company's general strategy as to manufacturing, and the machinery available for fabricating. It is not a secret that Acero prefers to fabricate a part using only one machine. Further, Mr. Fitzgerald admitted that he does not know that the Acero approach to production is more efficient or a competitive advantage over a competitor's approach; it is simply the way he has decided that Acero should operate.

Sixth, the value Bonelli provided as an employee at Acero is not a trade secret of Acero's. Plaintiff repeatedly touts its "hundreds of thousands of dollar" training investment in Bonelli, which remains unsubstantiated, however, courts in Pennsylvania have repeatedly said that "[a] trade secret does not include an employee's aptitude, skill, dexterity, manual and mental ability, or other subjective knowledge." *Shepherd v. Pittsburgh Glass Works, LLC.*, 2011 PA Super 156, 25 A.3d 1233, 1245 (2011); *see, e.g., Felmlee v. Lockett*, 466 Pa. 1, 351 A.2d 273, 276 (1976); *Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430, 434 (1960); *Pittsburgh Cut Wire Co. v. Sufrin*, 350 Pa. 31, 38 A.2d 33, 34 (1944); *Wellspan Health*, 869 A.2d at 997; *Christopher M's Hand Poured Fudge v. Hennon*, 699 A.2d 1272, 1275 (Pa.Super. 1997); *Oberg Indus., Inc. v. Finney*, 382 Pa. Super. 525, 555 A.2d 1324, 1326 (1989). The testimony at the hearing unequivocally establishes that Acero provided no specialized or formal

training to Bonelli, who only received on-the-job training. The skill he learned from his on-the-job training or subjective knowledge of his job at Acero is not protectable as a trade secret. *See Shepherd*, 25 A.3d at 1245.

The court finds in favor of defendants and against Acero on the misappropriation of trade secret claim and any request for any injunction based on it because (1) Acero has identified no protectable trade secret, (2) no confidential information or trade secret has been divulged by Bonelli, and (2) Vistek has not obtained, much less utilized, any confidential information or trade secret of Acero.

An appropriate order follows.

### ORDER

And now, this 15th day of October, 2014, upon consideration of plaintiff Acero precision's complaint and petition for preliminary and/or permanent injunction against defendants James Bonelli and Vistek Medical, Inc., the parties' legal submissions and supporting evidence, and having held evidentiary hearings on September 8 and 9, 2014, it is hereby ordered as follows:

1. By stipulation of the parties, this is a final order on the merits;

2. Plaintiff Acero precision's motion for permanent injunction is denied;

3. The court finds in favor of defendants James Bonelli and Vistek Medical, Inc. and against plaintiff Acero precision on all claims contained in the complaint;

4. Pursuant to the 2014 agreement, reasonable attorneys' fees are hereby awarded to defendant James Bonelli as the

prevailing party, to be assessed against plaintiff; and

5. James Bonelli will submit redacted fee bills to the court and to plaintiff within ten (10) days; plaintiff has ten (10) days after receipt to file any written objections, after which the court will issue a separate order.