J-A11042-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LETTERLE & ASSOCIATES, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEVEN J. TRESCHOW, AN | : | |
| INDIVIDUAL, AND P. JOSEPH | : | |
| LEHMAN, INC. | : | No. 1178 MDA 2016 |
| | : | |
| Appellants | : | |

Appeal from the Order Entered June 14, 2016
In the Court of Common Pleas of Centre County
Civil Division at No(s): 2015-988

BEFORE: SHOGAN, MOULTON, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED JULY 06, 2017**

Steven J. Treschow ("Mr. Treschow") and Joseph Lehman, Inc. ("Lehman") (collectively "Appellants") appeal from the June 14, 2016, order, which granted, in part, and denied, in part, the petition for a preliminary injunction filed by Letterle & Associates, Inc. ("Letterle").[1] After a careful review, we affirm, in part, and reverse, in part.

---

[1] This is an interlocutory appeal pursuant to Pennsylvania Rule of Appellate Procedure 311(a)(4), which permits immediate appeal for "[a]n order that grants or denies, modifies or refuses to modify, continues or refuses to continue, or dissolves or refuses to dissolve an injunction[.]" Pa.R.A.P. 311(a)(4).

[*] Former Justice specially assigned to the Superior Court.

The relevant facts and procedural history are as follows: Mr. Treschow was originally an employee of Chambers Environmental Group, Inc. ("Chambers"); however, on September 12, 2011, Letterle, a company which provides environmental consulting, purchased the assets of Chambers. By letter dated September 30, 2011, Letterle offered Mr. Treschow employment, with the condition that he execute a confidentiality, non-solicitation, and intellectual property agreement ("Letterle Agreement"), which Mr. Treschow did on that same date.

In relevant part, the Letterle Agreement provided that Mr. Treschow, while employed by the company and for a period of two (2) years after termination of his employment, would not "[s]olicit or induce, or attempt to solicit or induce, any customer or prospective customer of the company with which [Mr. Treschow] communicated with while employed by the company[.]" Letterle Agreement, 9/30/11, at 2 ¶4(a). Further, the Letterle Agreement provided that:

> [Mr. Treschow] agrees to hold and safeguard for the benefit of the company all confidential information acquired or developed by him during the employment relationship. [Mr. Treschow] will not...during the term hereof or thereafter, misappropriate, use for [Mr. Treschow's] own advantage, disclose or otherwise make available confidential information to any person, except in the good faith performance of [Mr. Treschow's] job duties while employed by the company to persons having a need to know such information for the benefit of the company or its business.

*Id.* at 3 ¶5(a).

The Letterle Agreement defined "confidential information" as follows:

*Confidential Information* means any materials or information (whether in written, printed, graphic, video, audio, electronically stored, disk or other format) regarding the company which (i) is not generally known to the public or within the industry; (ii) was acquired or learned by [Mr. Treschow] as a result of and during employment with the company; and (iii) relates to the business and affairs of the company and/or their respective customers. Without limiting the generality of the term, it includes existing and planned methods of operation, processes, programs, product formulas, designs, marketing activities, research, business expansion or divestiture plans; customer lists; the identities of key personnel and the requirements of the customers [of] the company; supply contracts or arrangements; the identities, special skills and compensation arrangements of key employees of the company; business plans and strategies; financing arrangements; and any other non-public information relating to the business and affairs of the company.

*Id.* at 1-2 ¶3(a) (italics in original).

On November 13, 2014, Mr. Treschow voluntarily ended his employment with Letterle and commenced employment with Lehman, which provides, in part, similar environmental services as those offered by Letterle.

Thereafter, one of Letterle's clients, Raymond J. Avent of the Marmon Group, LLC ("Marmon"), informed Letterle it had acquired the services of another consultant. Another client, the Mount Union Fire Department, informed Letterle that James Prohonic of Lehman had solicited its business.

Consequently, on January 12, 2015, Letterle sent a letter to Mr. Treschow reminding him of his obligations under the Letterle Agreement and requesting that he cease and desist from contacting Letterle's clients. On January 12, 2015, Mr. Treschow replied via a letter drafted by his counsel. Therein, Mr. Treschow denied breaching the Letterle Agreement, disclosing

any of Letterle's confidential information, or soliciting any of Letterle's customers or employees. *See* Mr. Treschow's Letter, dated 1/16/15. Mr. Treschow indicated that any contact he "had with Letterle customers [was] initiated by the customer and/or was of a personal nature. And, any information that [he]...shared is generally known and/or is otherwise not protect[ed] under Pennsylvania law." *Id.*

In response, on March 6, 2015, Letterle filed a complaint in equity seeking to enjoin Mr. Treschow from disclosing confidential information, as well as from soliciting Letterle's clients. *See* Letterle's Complaint, filed 3/6/15, at 9.[2] On June 12, 2015, Appellants filed an answer with new matter, and on July 1, 2015, Letterle filed a response to Appellants' new matter.

During the course of discovery, on May 18, 2016, Letterle took the depositions of Mr. Treschow and Martin T. Malone ("Mr. Malone"), who was a Lehman employee. Thereafter, on May 20, 2016, Letterle filed a petition for a preliminary injunction, indicating that the depositions "revealed certain information making it necessary for [Letterle] to file the...petition." *See* Letterle's Petition for Preliminary Injunction, filed 5/20/16, at 1. Specifically, Letterle averred, in relevant part, the following:

---

[2] In the complaint, Letterle also requested the trial court enjoin Mr. Treschow from working for Lehman, as well as requested the trial court enjoin Lehman from engaging in unfair competition and interfering with the contractual relationship between Letterle and Mr. Treschow.

**4.** At the deposition,...[Mr.] Treschow admitted being in contact with some of [Letterle's] current clients as recent as last week.

**5.** [Mr.] Treschow further acknowledged ongoing work with some of [Letterle's] clients, said clients which are specifically enumerated in [Letterle's] client/customer lists.

**6.** [Mr.] Treschow testified that he looked at the Letterle Agreement again after being put on notice by [Letterle's] letter of January 12, 2015. [Mr.] Treschow acknowledged he breached the agreement by soliciting a prospective client of [Letterle]....Said breach of [Appellants] is supported by an Affidavit of Thomas Emero and produced to [Appellants][.]

**7.** [Mr.] Treschow testified he provided lists of prospective clients to [Mr.] Malone on a weekly basis to be utilized in a weekly marketing meeting at [Lehman].

***

**9.** Based on testimony of [Mr.] Martin...[Lehman] was not aware of the restrictions placed on [Mr.] Treschow until they received [Lehman's] letter of January 12, 2015. However, since January 12, 2015, [Lehman] has not changed their pattern of behavior with respect to solicitation of [Lehman's] clients/customers.

**10.** [Letterle] will continue to suffer irreparable harm to its reputation and business if [Appellants] are not enjoined, pending a final hearing in this matter, from interfering with [Letterle's] customer relations, using or disclosing [Letterle's] confidential information and soliciting work from [Letterle's] clients.

*Id.* at 1-3.

Accordingly, Letterle requested the following relief:

**(a)** [Appellants] are forthwith enjoined from working for or soliciting in any form any of [Letterle's] clients/customers; and

**(b)** [Appellants] are forthwith enjoined from using or disclosing to any third party, [Letterle's] confidential, proprietary or trade secret information, including [Letterle's] client/customer data and files, and client/customer lists.

*Id.* at 3-4.

On May 24, 2016, Appellants filed an answer to Letterle's petition for a preliminary injunction. With regard to Letterle's request to enjoin Appellants from soliciting customers, Appellants denied that Mr. Treschow had solicited clients and "Mr. Treschow has refrained from soliciting any Letterle customers and/or prospective customers with which he had contact while employed by Letterle." **See** Appellants' Answer, filed 5/24/16, at 3.

With regard to Letterle's request to enjoin Appellants from using or disclosing to any third party Letterle's confidential, proprietary or trade secret information, Appellants admitted that Mr. Treschow provides a weekly list of prospective customers to Mr. Malone; however, Appellants "specifically denied that Mr. Treschow provide[s] a list of Letterle customers to Mr. Malone." **Id.** Appellants also denied that Mr. Treschow has "any 'customer list' (list of Letterle customers) other than the customer list that [Letterle] produced to [Appellants] in connection with [the] litigation." **Id.** at 2. Moreover, Appellants noted that Letterle's "customers are well known and a matter of public record[,]" and Mr. Treschow is "aware of these customers through his own personal knowledge and memory, the information is not protected." **Id.** at 4, 7.

On May 24, 2016, the trial court held oral argument on the matter, and on June 14, 2016, the trial court entered the following order:

> [Letterle's] petition for preliminary injunction is DENIED in part and GRANTED in part. [Mr.] Treschow is enjoined from using or disclosing to any third party [Letterle's] confidential,

proprietary or trade secret information, including [Letterle's] client/customer data and files, and client/customer lists.

Trial Court Order, filed 6/14/16.

In its accompanying opinion, the trial court clarified that it was denying Letterle's request to enjoin Mr. Treschow from soliciting Letterle's existing or prospective clients since Letterle failed to show that such relief was necessary to prevent immediate and irreparable harm that could not be adequately compensated by damages.[3] *See* Trial Court Opinion, filed 6/14/16, at 3. Moreover, the trial court found that, although Mr. Treschow may have solicited Letterle's clients prior to the January 12, 2015, letter, there was no evidence the conduct was ongoing or likely to cause immediate harm. *Id.* at 3-5.

In granting Letterle's request to enjoin Mr. Treschow from using or disclosing Letterle's confidential, proprietary, or trade secret information, the trial court clarified it was granting Letterle's request to enjoin Mr. Treschow from using or disclosing Letterle's customer lists, as well as Letterle's clients' data and files, as such constituted information not generally known to the public or within the industry, was acquired by Mr. Treschow during his employment, and related to the business affairs of Letterle. Accordingly, the trial court found Letterle's customer lists and client information met the

---

[3] As to Lehman, the trial court denied Letterle's request to enjoin it from soliciting Letterle's clients since Lehman was not a party to the Letterle Agreement. Trial Court Opinion, filed 6/14/16, at 3.

definition of "confidential information" under the Letterle Agreement. Further, the trial court concluded the information at issue constituted a trade secret. *Id.* at 5-8.

In support of its conclusions, the trial court pointed to the following factual findings: (1) When Mr. Treschow left Letterle, he had customer contact information, including phone numbers, on his personal phone;[4] *Id.* at 6; (2) Mr. Treschow forwarded information to his personal email account shortly before his employment with Letterle ended, *Id.*; (3) Mr. Malone testified that he maintains a customer list of "hot prospects," and Mr. Treschow attends the weekly meeting where the "hot prospects" are discussed, *Id.*; (4) Mr. Treschow provided the name and personal cell phone number of Terry Morder, Jr. of the Mount Union Fire Department to a Lehman employee; *Id.* at 6-7, and (5) "While customer lists are not always confidential, the [Letterle Agreement] specifically includes customer lists as an example of confidential information[,]" *Id.* at 8. Accordingly, the trial court concluded that Mr. Treschow had in his possession Letterle client information and such information constituted legally protected confidential, proprietary, or trade secret information of Letterle, which Mr. Treschow

---

[4] The trial court noted in its opinion that Mr. Treschow testified the phone containing this information was destroyed in the washing machine. *Id.* at 6 n.1.

should be enjoined from using or disclosing to third parties, including Lehman. *Id.* at 8.

This appeal followed on July 14, 2016,[5] and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellants claim the trial court erred in granting Letterle's preliminary injunction enjoining Mr. Treschow from using or disclosing Letterle's customer data, files, and lists. In this regard, Appellants initially claim that the activity Letterle seeks to restrain (the use and disclosure of confidential, proprietary, trade secret customer information) is not actionable in this specific case. Specifically, Appellants allege (1) Letterle failed to prove Mr. Treschow was in possession of customer data, files, or lists; (2) any customer data, files, or lists in Mr. Treschow's possession did not constitute confidential information under the Letterle Agreement as such information was generally known to the public or within the industry; and

---

[5] On June 24, 2016, Appellants filed a motion for post-trial relief and/or reconsideration. Generally, "[a] motion for post-trial relief may not be filed to orders...relating to...proceedings which do not constitute a trial." Pa.R.Civ.P. 227.1 (c), *Note*. Thus, the motion at issue is more properly considered under 42 Pa.C.S.A. § 5505, pertaining to motions for reconsideration. *See Jarl Investments, L.P. v. Fleck*, 937 A.2d 1113 (Pa.Super. 2007) (holding pre-trial evidentiary order for preliminary injunction immediately appealable without post-trial motions). Consequently, absent an appeal, the trial court had thirty days in which to rule on the motion. *See* 42 Pa.C.S.A. § 5505. Since the trial court did not rule on the motion, Appellants properly filed a timely notice of appeal on July 14, 2016.

- 9 -

(3) any customer data, files, or lists in Mr. Treschow's possession did not qualify for protection as a trade secret.

In reviewing preliminary injunction orders, "an appellate court is to conduct a searching inquiry of the record. Accordingly,...the scope of review in preliminary injunction matters is plenary." *Warehime v. Warehime*, 580 Pa. 201, 860 A.2d 41, 46 n.7 (2004).

With regard to the standard of review, appellate review of a trial court's order granting or denying preliminary injunctive relief is "highly deferential." *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount Inc.*, 573 Pa. 637, 828 A.2d 995, 1000 (2003). This "highly deferential" standard of review requires that:

> [I]n reviewing a trial court's grant or refusal of a preliminary injunction, an appellate court does not inquire into the merits of the controversy, but rather examines only the record to ascertain whether any apparently reasonable grounds existed for the action of the court below. We may reverse if the trial court's ruling amounted to an abuse of discretion or a misapplication of law.

*Warehime*, 580 Pa. at 209, 860 A.2d at 46 (quotation marks, quotations, and footnotes omitted).

Further, a preliminary injunction will not be granted unless the party seeking the injunction establishes six essential elements. *Id.* Specifically, that party has the burden of proving:

> 1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; 2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that

issuance of an injunction will not substantially harm other interested parties in the proceedings; 3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; 4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits; 5) that the injunction it seeks is reasonably suited to abate the offending activity; and, 6) that a preliminary injunction will not adversely affect the public interest.

*Id.* at 209-10, 860 A.2d at 46–47 (quotation marks and quotation omitted).

With regard to the fourth prong (whether the activity Letterle seeks to restrain is actionable and Letterle's right to relief is clear), we note the kinds of business interests that are considered legitimate and protectable include confidential information and trade secrets. ***Shepherd v. Pittsburgh Glass Works, LLC***, 25 A.3d 1233, 1244-45 (Pa.Super. 2011). In the case *sub judice*, the trial court ruled that Letterle's customer data, files, and lists were protected as confidential information under the definition provided in the Letterle Agreement. **See** Letterle Agreement, 9/30/11, at 1-2 ¶3(a). Additionally, the trial court concluded that Letterle's customer data, files, and lists were entitled to protection as trade secrets.

Regarding the latter, we note "under certain circumstances, customer lists and customer data may be entitled to protection as trade secrets." ***Iron Age Corp. v. Dvorak***, 880 A.2d 657, 663 (Pa.Super. 2005) (citing ***Morgan's Home Equipment Corp. v. Martucci***, 390 Pa. 618, 136 A.2d 838 (1957)).

Whether such information is protected depends upon the circumstances of its creation. We have previously held that:

> "[i]n many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information *which have been compiled by such firms* represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a non-disclosure contract."

> ***Robinson Electonic Supervisory Co. v. Johnson***, [397 Pa. 268], 154 A.2d 494, 496 (1959) (emphasis added); ***see also Bell Fuel Corp.*** [***v. Cattolico***], 544 A.2d [450], 460 [(Pa.Super. 1988)] (stating that "[w]here the information is not a particular secret belonging to the employer, developed through its efforts or investment, and of value to the continuation of the employer's business, no protection is afforded").

***A.M. Skier Agency, Inc. v. Gold***, 747 A.2d 936, 940 (Pa.Super. 2000) (emphasis in original) (internal citation omitted). ***See Shepherd***, 25 A.3d at 1244 ("A trade secret does not include an employee's...skill,...mental ability, or other subjective knowledge.") (quotation and quotation marks omitted)); ***Iron Age Corp.***, 880 A.2d at 663-64 ("[I]nformation will not be given injunctive protection as a trade secret if it can be obtained through legitimate means by a competitor....[T]o be classified as a trade secret, information must be an employer's actual secret and not comprise mere 'general trade practices.'") (quotation marks, quotations, and citations omitted)).

With these legal precepts in mind, we turn to an examination of the record to determine whether there are "any apparently reasonable grounds" for the trial court's preliminary injunction enjoining Mr. Treschow from using or disclosing Letterle's customer data, files, and lists. ***See Warehime***, ***supra***; ***Summit Town Centre, Inc.***, ***supra***.

With regard to the trial court's finding that Mr. Treschow stored Letterle's customer information on his personal cell phone, the following transpired upon questioning of Mr. Treschow by Letterle's counsel during the deposition:

> **Q:** Did you use the same cell phone that you had at the time you were employed by Letterle as when you were employed by Lehman?
>
> **A:** Yeah, it was my personal cell phone.
>
> **Q:** It was your personal cell phone?
>
> **A:** Yeah.
>
> **Q:** Did it have business contacts on it?
>
> **A:** Not contacts. If clients chose to call me on that phone, which actually they're no longer stored on there because my phone went through our washer at home, and—so I had to get a new phone a couple of months ago. So a lot of those contacts are no longer there.
>
> ***
>
> **Q:** Is it possible Terry Morder's information resided on your cell phone?
>
> **A:** It's possible, yes.
>
> **Q:** Okay. Is it possible other people's contact information resided on that cell phone?
>
> **A:** It's possible, yes.
>
> **Q:** Okay. When did that cell phone go through the washing machine?

**A:** Somewhere like four to six months ago.

Steven Treschow Deposition, 5/18/16, at 64-65, 150-51.

With regard to the trial court's factual finding that Mr. Treschow forwarded Letterle's clients' email addresses and/or had possession of a customer list, Mr. Treschow testified as follows upon questioning by Letterle's counsel:

> **Q:** Okay. When you left Letterle, did you take any kind of customer list with you?
>
> **A:** No.
>
> **Q:** Any printed list?
>
> **A:** No
>
> **Q:** Anything off a computer?
>
> **A:** No.
>
> **Q:** Okay. Did you retain business cards of any contacts that you may have made while you were at Letterle?
>
> **A:** I don't know.
>
> **Q:** Okay. Did you—some people, as a regular course of business, maintain a business card file or a folder of some sort. Do you do that?
>
> **A:** I have one, but in all honesty, with the electronic age, not too many people carry business cards anymore.
>
> **Q:** Okay. Did you have any kind of, whether it's the actual cards or any kind of indexing on the computer, did you maintain, in electronic or paper format, those business contacts?
>
> **A:** I did not.
>
> **Q:** So when you went to work at Lehman, you had no information regarding customer contacts you had while you were at Letterle—is that accurate?
>
> **A:** No.
>
> **Q:** You did not have any of those contacts?
>
> **A:** I did not.

**Q:** Okay.  Did you have Terry Morder's cell phone number?

**A:** Not to my knowledge.

**Q:** Did you download on any kind of drive, external drive or flash drive or USB port, your contact listing off of your computer from Letterle?

**A:** No.

**Q:** Did you forward any emails from your Letterle account to your personal email account?

**A:** I don't remember.

**Q:** Okay.  Did you maintain a personal email account?

**A:** I have one, yes.

**Q:** Okay.  Is it the Hotmail account we saw?

**A:** Yeah.

***

**Q:** Okay.  Do you know how Jim Prohonic would have gotten Terry Morder's personal cell phone number?

**A:** I don't know.

**Q:** Okay. Do you recall giving that phone number to Jim Prohonic?

**A:** I don't.

**Q:** Do you recall Jim asking you for his phone number?

**A:** No.

***

**Q:** This is an affidavit that Mr. Morder provided to us.

***

**A:** Yes.

***

**Q:** Paragraph 11, [states] [o]n or around December 9th, I received a phone call on my personal cell phone from Jim Prohonic, who said he obtained my name and cell number from [Mr. Treschow].

Would you agree with that?

**A:** No.

- 15 -

**Q:** Okay. So your testimony is you did not provide that information to Jim?

**A:** I probably....I likely provided the name, but I did not provide the cell phone number.

*Id.* at 87-89, 95.

Further, during discovery, Letterle asked Mr. Treschow to produce any emails he had sent to Letterle's customers or prospective customers after he was hired by Lehman. *Id.* at 126-27. During the deposition, Letterle's counsel asked Mr. Treschow how he examined his email to comply with the discovery request, and Mr. Treschow indicated that he conducted a "broad search for certain names, not a specific list, but just certain names." *Id.* at 128. Moreover, with regard to Mr. Treschow forwarding emails from his Letterle work account to his personal Hotmail account, Mr. Treschow admitted that, while working for Letterle, he forwarded an email from Mr. Emero to his personal Hotmail account, but he could not remember whether he had forwarded any other client contact emails. *Id.* at 148-49.

With regard to the trial court's finding that Mr. Treschow provided Mr. Malone of Lehman with "hot prospects," Mr. Treschow testified as follows at his deposition upon questioning by Letterle's counsel:

**Q:** Okay. [Marty] Malone described weekly staff meetings with the directors at Lehman.

**A:** Yes.

***

**Q:** Do you attend those meetings?

**A:** Sometimes.

**Q:** Okay. Do you provide prospect lists during those meetings?

**A:** We usually provide weekly prospects to Marty, and Marty handles all the prospects.

**Q:** Okay. How do you provide Marty a prospect list?

**A:** Usually by Excel spreadsheet.

**Q:** Okay. Is it a running list, meaning you just add to it, or do you provide him a new spreadsheet weekly?

**A:** Usually a new spreadsheet.

**Q:** Okay. Do you retain copies of those?

**A:** I don't. I just overwrite one from one week to the other.

**Q:** Do you know if Marty maintains those?

**A:** I don't know.

**Q:** Okay. What do you do at the meetings with that prospect list?

**A:** You really only discuss new prospects. And really all we do is say, Okay. Here's a new prospect.

**Q:** Okay. Did you ever include the Marmon Group as one of your new prospects?

**A:** No.

**Q:** Did you ever discuss Marmon at any of those meetings?

**A:** Marmon was discussed, yes.

**Q:** Okay. In what context was Marmon discussed?

**A:** Marmon was discussed after they became a client of Lehman.

**Q:** Okay. How did they become a client of Lehman?

**A:** Mr. Ray Avent, who is [the] environmental manager for Marmon, called me shortly after my employment with Lehman and wanted to retain my services.

**Q:** Okay. How did Mr. Avent find you?

**A:** We are associates on LinkedIn, and Mr. Avent has my personal cell phone number and knows where I live and knows my wife and, so....

\*\*\*

**Q:** You made no contact with him—well, let me ask this. Did you make any contact with him when you left Letterle?

**A:** I believe I may have sent the same email I sent to a lot of people, just saying, I'm leaving Letterle. The person taking over your project will be Jed Hill, and that's it. So I believe that's what I sent him.

\*\*\*

**Q:** Okay. Did you send that email to a specific list of people?

**A:** Not really, just people that [Letterle], obviously, did work for or were in the process of doing work for, that I wanted to make sure there was some kind of transition, that they knew that I was going, but that they would be taken care of.

**Q:** Okay.

**A:** But there was no specific list.

\*\*\*

**Q:** Okay. Did you feel sharing the name Terry Morder with Jim Prohonic was a violation of the nonsolicitation agreement?

**A:** No.

**Q:** Okay. And why not?

**A:** That information can be readily obtained.

\*\*\*

**Q:** Okay. But you did not feel that their actual customer list was confidential; is that accurate?

**A:** That's accurate.

**Q:** So you felt you could share the customer list with Lehman; is that accurate?

**A:** No. I never shared a customer list with Lehman.

*Id.* at 92-95, 99, 101-02, 118.

With regard to the instance involving the Mount Union Fire Department, as the trial court indicated, Mr. Treschow admitted that an employee of Lehman, James Prohonic, asked Mr. Treschow for the name of the contact at the Mount Union Fire Department. *Id.* at 63. Mr. Treschow testified he gave Mr. Prohonic the name of the fire chief, but he did not

provide him with a phone number. *Id.* at 64. Mr. Treschow noted that Mr. Prohonic was independently aware that the Mount Union Fire Department was a customer of Letterle's as he had driven by the fire hall when Letterle employees were performing work at the site. *Id.* at 63-64.

Further, it bears mentioning that Mr. Treschow denied providing Lehman with the client contact information for Worley & Obetz, Trican Well Services, or Jeld-Wen, who were clients of Letterle. *Id.* at 121-23, 136. He also denied including their names, as well as many other business names, on any prospective client list, which he provided to Mr. Malone during his employment with Lehman. *Id.* at 140-144, 147. He confirmed that the Mount Union Fire Department was the only former client of Letterle about which Mr. Prohonic asked. *Id.* at 148. Mr. Treschow noted that he did not have a client list from Letterle; however, even if he did, it would have been of little value since "a lot of the work that [Letterle] had was at the final stages of the project life, and there was very little work left." *Id.* at 152.

Martin Malone testified at his deposition that, prior to Lehman hiring Mr. Treschow, Mr. Malone met with Mr. Treschow to determine whether he would "fit in" with Lehman. Martin Malone Deposition, 5/18/16, at 15. During the meeting, the men did not discuss Letterle's client base or discuss any specific clients. *Id.* at 16, 26. Mr. Malone noted that, upon Lehman hiring Mr. Treschow, Lehman issued a press release to the industry, but it was not sent to any specific clients. *Id.* at 37-38.

Mr. Malone indicated that Lehman has weekly marketing meetings at which prospective clients are reviewed. *Id.* at 40. Mr. Malone referred to these as "hot prospects." *Id.* He testified that Mr. Treschow attends these meetings and presents "a list of prospects[.]" *Id.* at 41. Letterle's counsel asked Mr. Malone whether any of the following clients were placed on the list by Mr. Treschow as possible "hot prospects:" Marmon, United Refining Company, PWI, Inc., Worley & Obetz, and Trican Well Services. *Id.* at 42-44. With regard to each business, Mr. Malone testified either that he could not remember whether they were presented as prospective clients or that he did not believe they had been presented as such. *Id.* Mr. Malone testified the only client he could remember Mr. Treschow presenting was Sheetz. *Id.* at 44. However, Mr. Malone indicated that he remembered Marmon being discussed at one of the weekly meetings, although he could not remember in what capacity. *Id.* at 47. He did not remember Mr. Treschow providing anyone with a contact name for Marmon, and he was unaware of any meetings that Lehman had with Mr. Avent of Marmon. *Id.* at 47-48.

Upon questioning by Letterle's counsel, Mr. Malone testified as follows regarding Mr. Treschow's possession of a client list:

> **Q:** Okay. Did you ever see a list from [Mr. Treschow] of clients? Did you ever see any kind of list generated by [Mr. Treschow], or did he ever provide a list of clients.
>
> **A:** A list of our clients?
>
> **Q**: A list of clients in any form. Did you ever see a list of clients from him when he first became employed?
>
> **A:** Not that I remember.

**Q:** Okay. Do you recall at any of those meetings whether he was ever able to provide a list?

**A:** Would you ask me that again, please?

**Q:** Sure. At the Monday or Friday meeting, did he ever come with a list of clients?

**A:** Not that I recall, no.

*Id.* at 50-51.

In addition to the depositions of Mr. Treschow and Mr. Malone, the record contains the sworn affidavits of Terry Morder, Jr., dated February 20, 2015, and Thomas D. Emero, dated November 4, 2015.

Mr. Morder, of the Mount Union Fire Department, confirmed in his affidavit that he was Mr. Treschow's contact when he worked for Letterle. ***See*** Affidavit of Terry Morder, Jr., dated 2/2/15. Mr. Morder indicated that, after Mr. Treschow left Letterle, he received a telephone call on his personal cell phone from Mr. Prohonic of Lehman, who indicated "he obtained [Mr. Morder's] name and cell phone number from [Mr.] Treschow." ***Id.*** at 2. He indicated the purpose of Mr. Prohonic's call was to solicit him as a client for Lehman.

Mr. Emero, of the Clinton County Economic Partnership, confirmed in his affidavit that he met with Mr. Treschow when he was employed at Letterle for the purposes of discussing a proposal. ***See*** Affidavit of Thomas D. Emero, dated 11/4/15. Mr. Emero indicated that, just prior to leaving Letterle, Mr. Treschow solicited him in an attempt to gain business for Lehman. ***Id.*** at 2.

Upon conducting an extensive review of the record, we conclude there are no "apparently reasonable grounds" for the trial court's order preliminarily enjoining Appellants from "using or disclosing to any third party [Letterle's] confidential, proprietary or trade secret information, including [Letterle's] client/customer data and files, and client/customer lists." Trial Court Order, filed 6/14/16. *See Warehime*, *supra*.

With regard to Letterle's customer files and lists, the evidence reveals that, aside from a list of customers provided by Letterle during the litigation, Mr. Treschow did not have in his possession any customer files or lists. While Mr. Malone maintained such a list for Lehman, there is no evidence Mr. Treschow had such a list of Letterle customers.

Moreover, as to whether Mr. Treschow had in his possession any Letterle customer data, the evidence reveals that Mr. Treschow had a personal cell phone on which the numbers of Letterle customers were captured when they telephoned Mr. Treschow; while he was working for Letterle, Mr. Treschow forwarded an email from Mr. Emero to his personal Hotmail email; and Mr. Treschow had the name and cell phone number of the fire chief of the Mount Union Fire Department, Mr. Morder, who was a Letterle customer.

However, inasmuch as this customer data was developed in the normal course of business, was not compiled by Letterle, and could have been obtained through legitimate means, we agree with Appellants that the

- 22 -

trial court abused its discretion in ruling such customer data to be a Letterle trade secret. **See Iron Age Corp.**, 880 A.2d at 663 (indicating there is no legal incentive to protect customer data compiled in the normal course of business); **A.M. Skier Agency, Inc.**, **supra** (holding where customer lists/data is not compiled by employers, may be obtained through legitimate means, and is no particular secret of the employer it is not entitled to protection as a trade secret). Additionally, we agree with Appellants that such customer data is of the type "generally known to the public or within the industry" such that it does not meet the requirements of "confidential information" under the Letterle Agreement. **See** Letterle Agreement, 9/30/11, at 1-2 ¶3(a). Accordingly, the trial court abused its discretion in concluding such customer data required protection from disclosure or use by Mr. Treschow.

In conclusion, there are no "apparently reasonable" grounds for the trial court's conclusion that the activity Letterle sought to restrain (Mr. Treschow's use and disclosure of customer data, files, and lists in his possession) was actionable. **See Warehime**, **supra**. Thus, we conclude the trial court erred in granting Letterle's request for the preliminary injunction in this regard, and we reverse this portion of the trial court's June

14, 2016, order.[6]   As no party has challenged the trial court's denial of the preliminary injunction as to Letterle's request to enjoin Appellants' solicitation of Letterle customers, we affirm this portion of the trial court's June 14, 2016, order.

Affirmed, in part; Reversed, in part; Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/6/2017

---

[6] In light of the foregoing, it is unnecessary to address Appellants' remaining issues (*i.e.*, that Letterle did not meet the remaining prongs necessary for the issuance of a preliminary injunction; the trial court erred in failing to consider three affidavits submitted by Appellants after oral argument; and the trial court erred in failing to grant Appellants' motion for reconsideration).